**BANCO DE ESPANA v. FEDERAL RESERVE BANK OF NEW YORK.**

**SAME v. UNITED STATES LINES CO.**
**SAME v. SOLOMON.**
**Nos. 370–372.**

Circuit Court of Appeals, Second Circuit.
July 8, 1940.

John Foster Dulles, of New York (
(Sullivan & Cromwell, Inzer B. Wyatt, and
Henry P. deVries, all of New York City,
on the brief), for plaintiff-appellant.

Henry L. Stimson, Sp. Asst. to Atty.
Gen., and Francis M. Shea, Asst. Atty. Gen.
(John T. Cahill, U. S. Atty., William L.
Lynch, Asst. U. S. Atty., and Winthrop,
Stimson, Putnam & Roberts, all of New
York City, and Melvin H. Siegel, Sp. Asst.
to Atty. Gen., on the brief), for defendants-
respondents.

Before SWAN, CHASE, and CLARK,
Circuit Judges.

CLARK, Circuit Judge.

These three appeals, ably briefed and
argued, bring before us important and fas-
cinating questions reaching into the realms
of international law and polity. The ac-
tions here involved all arise from the pur-
chases of about six and a half million dol-
lars' worth of silver made by the United
States Secretary of the Treasury in the
summer of 1938 from certain persons pur-
porting to act as the government of Spain.
Before any payments were made, notice
was served upon all the defendants that the
Spanish government's title to the silver was
contested by the Banco de Espana, which
claimed to be the true owner thereof. Nev-
ertheless the Treasury paid the amount due
on the silver and completed the acquisition
of possession. Three actions were insti-
tuted by the Banco de Espana—one on
June 4, 1938, for possession, or, in de-
fault thereof, for the value, of a first
shipment of silver, together with damages
for its detention, against the Federal Re-
serve Bank of New York, which had acted
as fiscal agent of the United States in re-
spect to that transaction; a second on July
2, 1938, for like relief concerning a second
shipment of silver, against the United
States Lines Company, which had trans-
ported that shipment across the ocean;
and a third on August 15, 1938, seeking only
possession of the three lots of silver,
against Sigmund Solomon, individually and
as Superintendent of the United States As-
say Office at New York, who was alleged
to be then actually in possession of all the
silver so purchased by the Secretary of the
Treasury. The first two actions were be-
gun in the Supreme Court of the State of

New York, but were removed to the District Court of the United States for the Southern District of New York by defendants. The last action was commenced in the District Court.

All three defendants asked for summary judgments and also moved to dismiss in each action, claiming the protection of the sovereign immunity of the United States. The United States Attorney appeared specially on behalf of the United States and made a motion to dismiss all three suits for the same reason. The District Court denied the motions to dismiss in the cases against the Federal Reserve Bank of New York and the United States Lines, but awarded summary judgments for defendants on the merits. The motion to dismiss the action against Solomon was granted, but the court added that if sovereign immunity did not require dismissal of that action, summary judgment would be directed in Solomon's favor. The appeals by the Banco de Espana necessitate a review of each determination made by the District Court.

I. *The Propriety of Summary Judgment.* In awarding summary judgments for the defendants in the first two actions and suggesting a like result on the merits of the third action, the District Court concluded that the plaintiff was not entitled to the silver in question. The court reached this conclusion upon the basis of the affidavits submitted by defendants averring that the silver, conceded to have belonged originally to the plaintiff, had become subject to a power of disposal by the Spanish government, before the sales to the United States took place, by virtue of valid governmental acts committed in Spain. The particular basis for this holding was an affidavit of Fernando de los Rios, Ambassador of Spain to the United States, made for submission in this action on October 17, 1938, which alleged the acquisition of such power by the government he then represented on the basis of a governmental decree and ministerial orders, of which copies were attached to the affidavit as exhibits. Other affidavits were submitted on behalf of defendants, of which one was by Henry Morgenthau, Jr., Secretary of the Treasury of the United States, wherein the Secretary described in some detail his dealings with Ambassador de los Rios and asserted that he had accepted and acted upon the representations of title and full power to sell made by the Ambassador on behalf, and as the duly accredited and accepted representative, of the Spanish government at the time of the sale and delivery of the silver to the United States.

In response to these affidavits plaintiff presented affidavits challenging the legal effectiveness and the adequacy of proof of the governmental acts in Spain, relied on by its opponents as having given the Spanish government title to make the sale. It also presented the suggestion of the chargé d'affaires of the present Spanish government to the United States, which superseded the earlier government and was recognized by the United States in the spring of 1939, to the effect that his government now desired that the matters here involved should be determined after trial on the merits, rather than that, as an act of international comity, conclusive effect should be given to the statements of Senor de los Rios.

We are therefore brought to the question whether the court below was correct in ruling that on all the moving papers there was presented no genuine issue as to any material fact and that judgment should go for the defendants. Rule 56(c), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

To the following extent the facts are undisputed: In January, 1938, the Secretary of the Treasury arranged with Fernando de los Rios, the Spanish Ambassador in Washington, to purchase silver from the Spanish government. A memorandum of the procedure to be followed was drafted by Treasury officials, and it mentioned the Federal Reserve Bank and the Banco de Espana as the fiscal agents of the two governments. On March 29, 1938, Senor de los Rios notified Secretary Morgenthau that Spain was ready to sell 5,000,000 troy ounces of silver. The Federal Reserve Bank of New York handed to de los Rios a cable addressed to the Banco de Espana, offering to purchase the 5,000,000 ounces. On April 1, de los Rios delivered to the Treasury a copy of a cable accepting the offer. The cable was signed Negrin, Premier and Minister of Finance. The silver arrived in due season on the Normandie, consigned by "Etablissements Edouard Aget" to the "Reserve Federal Bank New York or to its order (for the account of the Consul General of Spain, 515 Madison Avenue, New York)." At this point the Banco de Espana notified the Federal Reserve Bank that the title of the Spanish

government was disputed. But the shipping documents were obtained by the Federal Reserve Bank of New York from the Spanish Consul in New York, and the silver was transported to the United States Assay Office. Payment was effected by a check drawn by the Federal Reserve Bank on the Treasurer of the United States, payable to the order of "The Ambassador Extraordinary and Plenipotentiary of Spain to the United States." All other shipments were made in the same manner, except that the two banks dropped out of the transactions, subsequent bills of lading named the Spanish government as consignor, and the United States Assay Office as consignee, and later checks in payment were signed on behalf of the Superintendent of the Assay Office.[1]

The defendants' contentions on the merits of the issues here presented are in substance three: (1) Determination by the Secretary of the Treasury, on behalf of the Executive branch of our government, that the title of the Spanish government to the silver was good, and the transaction valid, was binding upon, and not subject to review by, the courts; (2) the statement made here by the representative of the Spanish government of its claim of title and his acceptance of payment were actions behind which, for reasons of international comity, the courts could not go; (3) in any event there was appropriate proof of governmental acts in Spain whereby the Spanish government acquired a title to the silver which cannot be disputed here. As we have seen, plaintiff's challenge to these contentions goes to the very existence of any such acts, as well as their adequate proof and their legality if proven. We shall take up defendants' contentions in order and state plaintiff's countercontentions as they are apposite.

■■■ (1) We do not believe the acts of Secretary Morgenthau in accepting the representations of the Spanish Ambassador are binding upon the courts on a controversy as to the validity of a purchase of property by the United States which does not affect the international or diplomatic relations of our government, but turns rather on the effect of local law on the vendor's title. The courts will leave for the Executive the determination of all "political" issues; in the international field this means such matters as the recognition of new governments or the making of treaties, not the direct determination of questions of property. Cf. Doe ex dem Clark v. Braden, 16 How. 635, 57 U.S. 635, 14 L.Ed. 1090; Z. & F. Assets Realization Corp. v. Hull et al., — App.D.C. ——, 114 F.2d 464, June 3, 1940; Field, The Doctrine of Political Questions in the Federal Courts, 8 Minn.L.Rev. 485; Jaffe, Judicial Aspects of Foreign Relations (1933) 8–78. The decisions investigating the title to the Spanish vessel The Navemar are perhaps not controlling, since there the Executive Department refused to take a position. Compania Espanola v. The Navemar, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667, reversing The Navemar, 2 Cir., 90 F. 2d 673; The Navemar, 2 Cir., 102 F.2d 444. But other recent decisions, particularly those concerning the assignment by Soviet Russia of all its claims against American nationals to the United States, indicate that the validity of the title acquired is subject to judicial inquiry. United States v. Bank of New York, 296 U.S. 463, 480, 56 S.Ct. 343, 80 L.Ed. 331; United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134; Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224; United States v. Moscow Fire Ins. Co., 60 S.Ct. 706, 84 L.Ed. 1036, Id., 60 S.Ct. 725, 84 L.Ed. 986, affirming Moscow Fire Ins. Co. v. Bank of New York & Trust Co., 280 N.Y. 286, 20 N. E.2d 758, by an equally divided court; 47 Yale L.J. 292; 49 ibid. 324; 51 Harv. L.Rev. 162; 31 Am.J.Int.L. 481, 675; 5 U. of Chi. L. Rev. 280. A broader interpretation of "political" questions is unnecessary to the effective conduct of diplomatic relations with other countries and is undesirable as subjecting issues of private property to the changing circumstances of international politics beyond what is inevitable in any event. Our conclusion against the contention of the defendants here makes unnecessary consideration of the further claim made by the plaintiff that in any event the Secretary of the Treasury is not the proper person to exercise the powers of the Executive in international matters, and the defendants' response that under the Silver Purchase Act of 1934, 31 U.S.C.A. § 734a, and his general powers with respect to finance, 5 U.S.C.A. § 242, he has adequate authority in the premises.

---

[1] Payment was 95% of the cost of the silver, since final payment was to be made on the basis of figures established by the United States Mint or Assay Office or recognized American refineries. Final settlement has not yet been made as to any of the shipments.

■■ (2) We incline to the view that defendants' second contention is valid. As we shall see, the governmental acts of a foreign country done within its own borders are not subject to examination in our courts. It would seem to follow that the statement that such acts had taken place, made to our courts officially on behalf of the friendly foreign government by its accredited representative, must be accepted as proof of that fact, especially when there has been, as here, prompt acceptance of the money payments made by our government on the basis of like representations. Indeed, such was our holding in The Navemar, 2 Cir., 90 F.2d 673, which decided that the representation there made on behalf of the Spanish government of the acquisition of the ship in question was final so far as the courts were concerned. The reversal of this decision in Compania Espanola v. The Navemar, supra, is not of necessity an expression of a contrary view, since the Supreme Court held there had been no taking of possession of the ship and hence there was not a governmental act done in Spain. Cf. The Navemar, 2 Cir., 102 F.2d 444; 52 Harv.L.Rev. 1175; 33 Am.J.Int.L. 531. But the point is not made clear, and on its authority the New York Court of Appeals has ruled in Lamont v. Travelers Ins. Co., 281 N.Y. 362, 24 N.E.2d 81, 85, in a controversy relating to moneys claimed by the Mexican government, that "the assertion of the claim gives to the foreign government only the right to intervene and prove its allegation that it owns the property," but "does not constrain the court to refuse jurisdiction of that property."

In view of the doubt raised by these holdings we prefer not to rest our decision on the Ambassador's claim of title alone. He has gone further to set forth the actions taken by his government in acquiring its title, thus affording a basis for the defendants' final contention, to which we now turn.

(3) Defendants finally contend that a showing of governmental acts occurring in Spain, asserted by the then recognized Spanish government to result in a borrowing of the silver, with power to transfer the title thereto, settles the issues in their favor, since the validity and legal effect of such acts are not matters into which we may inquire. They contend further that such a showing was made by Ambassador de los Rios' affidavit and its attached exhibits. Plaintiff attacks not only the proof offered, but also the legal effectiveness of the acts if shown. These acts consisted of a law of the Spanish Republic of October 14, 1937, duly published in the Gazette of the Republic, authorizing legislation by ministerial decree under the circumstances and for the purposes therein specified; an unpublished decree of April 29, 1938, purporting to issue under the foregoing law and authorizing the Spanish government to borrow silver from the Banco de Espana and further authorizing the Minister of Finance and Economy to dispose of the silver for the government; and a series of ministerial orders in May, June, and July, 1938, commanding the Banco de Espana to loan to the government the quantities of silver here involved and directing shipment of them to the Federal Reserve Bank of New York and the United States Assay Office. See the opinion below, D.C.S.D. N.Y., 28 F.Supp. 958, at pages 966–970. Plaintiff's attack, made by affidavits of experts in Spanish law, is to the effect that secret decrees are and were invalid under Spanish law.

■■ We agree, however, with the contentions of the defendants that the question of the validity under Spanish law of the secret decree, or of any other step in the purported acquisition of title to the silver by the Spanish government, is not open to examination by us. If these acts took place, they took place within Spain. It has been squarely held that the courts of this country will not examine the acts of a foreign sovereign within its own borders, in order to determine whether or not those acts were legal under the municipal law of the foreign state. Earn Line S. S. Co. v. Sutherland S. S. Co., D.C.S.D.N.Y., 254 F. 126, 129, affirmed sub nom., The Claveresk, 2 Cir., 264 F. 276; cf. The Navemar, 2 Cir., 102 F.2d 444, 449; Hewitt v. Speyer, 2 Cir., 250 F. 367. The position we took in those cases finds ample foundation in numerous decisions of the Supreme Court, including Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456; Oetjen v. Central Leather Co., 246 U.S. 297, 38 S Ct. 309, 62 L.Ed. 726; and Ricaud v. American Metal Co., 246 U. S. 304, 38 S.Ct. 312, 62 L.Ed. 733. That these three rulings involved the acts of military rather than civil officials seems unimportant. Of the precedents cited as contrary to the Earn case, supra, Canada Southern Railway Co. v. Gebhard, 109 U.

S. 527, 3 S.Ct. 363, 27 L.Ed. 1020, considered the validity of a Canadian act under Canadian law, but the court's power to do so was neither raised nor discussed. Sabariego v. Maverick, 124 U.S. 261, 8 S.Ct. 461, 31 L.Ed. 430, and Shapleigh v. Mier, 299 U.S. 468, 57 S.Ct. 261, 81 L.Ed. 355, 113 A.L.R. 253, both passed on the validity of Mexican acts under Mexican law, but in each case the Mexican government was not a foreign government, but one to which we had succeeded when sovereignty over the lands in question was ceded to the United States. In effect, the Supreme Court sat in these cases as a Mexican court passing on Mexican law.[2] We regard none of these rulings as contradicting our decision in The Claveresk, supra.[3] See, also, A. M. Luther v. James Sagor & Co., [1921] 3 K. B. 532, 550, 557; Princess Paley Olga v. Weisz, [1929] 1 K B. 718; United States v. Belmont, supra, 301 U.S. at pages 328, 333, 57 S.Ct. 758, 81 L.Ed. 1134; Guaranty Trust Co. v. United States, supra, 304 U.S. at page 140, 58 S.Ct. 785, 82 L.Ed. 1224; 26 Am.J.Int.L. 261, 270; 31 ibid. 675; 39 Yale L.J. 1130, 1153 et seq.; 47 ibid. 292.

Nor are we persuaded that the doctrine there set forth should be limited to situations in which the foreign act is committed in a manner "colorably valid" under foreign law. It should make no difference whether the foreign act is, under local law, partially or wholly, technically or fundamentally, illegal. No such distinction may be gleaned from the cases. So long as the act is the act of the foreign sovereign, it matters not how grossly the sovereign has transgressed its own laws. Hence the affidavits presented on behalf of plaintiff as to the correct interpretation of Spanish law do not avail to prevent summary judgment.

■ Plaintiff also claims that the principle under discussion derives its basic strength from considerations of international comity which have no relevance to the instant case because of the suggestion filed with the court on behalf of the present Spanish government in effect asking for a judicial inquiry into the legality of the seizure and sale of the silver. This suggestion is understandable, for the present Spanish government is naturally desirous of recovering for the Banco de Espana the silver taken by the former government before it was deposed. But the principle of The Claveresk, supra, is not entirely a matter of comity. Persons who dealt with the former Spanish government are entitled to rely upon the finality and legality of that government's acts, at least so far as concerns inquiry by the courts of this country. See Guaranty Trust Co. v. United States, supra, 304 U.S. at page 140, 58 S.Ct. 785, 793, 82 L.Ed. 1224. While that decision speaks of acts "valid when entered into" and the act of taking the silver is claimed to have been void, ab initio, the acts of the foreign sovereign within its dominions are deemed "valid when entered into," irrespective of their status under foreign law.

■ There remains the question whether any governmental acts took place in Spain. Plaintiff disputes the existence of such acts in two ways. First it contends that the acts, if they took place, were unlawful under Spanish law, that under Spanish law an illegal act by a public officer strips him of his official cloak and makes his act a private one, and that such a "private" act cannot be deemed governmental. But this is only a variation of the argument we have just rejected. By a "governmental act" is meant no more than a step physically taken by persons capable of exercising the sovereign authority of the foreign nation. The officials of the then-recognized Spanish government possessed such authority. If they purported to act in their official capacity, that physical fact precludes us from examining the validity of their acts under local law. The Spanish local law as a whole is of no concern to us, and it follows that we may not employ one doctrine of that law—that the illegal act of a public officer is deemed a private act—in order to gainsay the physical occurrence of an official act by an officer of the Spanish government.

Plaintiff next contends that defendants have furnished no admissible proof of any such governmental acts. It thus attacks the

---

[2] In Sabariego v. Maverick, supra, the acts were really acts of the old Spanish government, to which Mexico succeeded. As successor to Mexico, the Supreme Court applied Spanish law, as a Mexican court would have done.

[3] Certain statements in the Sabariego case, supra, 124 U.S. at page 293, 8 S.Ct. 461, 31 L.Ed. 430, appear at odds with the rationale of The Claveresk, supra, but those statements are dicta which cannot stand in the face of the Underhill, Oetjen, and Ricaud cases, supra.

affidavit of Ambassador de los Rios, which we have referred to above. This affidavit, containing the Ambassador's statements that he arranged for the silver sale and received payment therefor on behalf of his government, and supported by exhibits setting forth the decree and ministerial orders by which the Spanish government acquired its claimed interest in the silver— if it is admissible as proof of the facts it recites on a motion for summary judgment— offers convincing evidence of a governmental act by the then Spanish government performed in Spain, and therefore conclusive upon us here under the legal principles we have just stated. Plaintiff urges, however, that the affidavit does not satisfy the requirement of Rule '56(e) that affidavits submitted on motions for summary judgment "shall show affirmatively that the affiant is competent to testify to the matters stated therein," since an ambassador is immune to process and therefore cannot be forced to testify in a lawsuit.

 It can be assumed that if the Ambassador should refuse to submit to cross-examination, he would be imcompetent to testify to the matters set forth in his affidavit. The Dubois Case, Moore, Digest of Int.Law (1906) 642. But the Ambassador's immunity is undoubtedly a waivable one. United States v. Ortega, C.C.E.D.Pa., 27 Fed.Cas. 359, No. 15,971. Whatever privilege the Ambassador himself or the government had as to his testimony, plaintiff would be unable to prevent him from surrendering it. A bona fide affidavit to support a summary judgment must necessarily be a statement of the facts which the moving party knows and is able to substantiate at the trial. Here the Ambassador could testify at trial to the facts he has set forth without let or hindrance of the plaintiff. There is no more occasion to assume that he did not intend to substantiate his affidavit with his testimony, should that become necessary, than there is to believe that the legal experts who executed affidavits in behalf of the plaintiff would not be willing to repeat their statements at a formal trial.

 Plaintiff argues, however, that an ambassador must make an express surrender of his privilege before his affidavit can be held to show his competence to testify in the matter stated therein. In Michigan a similar court rule, Rule 30, Mich. Court Rules Ann. (Searl, 1933), apparently has been strictly construed to require a positive statement in the affidavit that the affiant,

if sworn as a witness, could testify competently to the facts set forth. Birgbauer v. Aetna Casualty & Surety Co., 251 Mich. 614, 232 N.W. 403; Terre Haute Brewing Co. v. Goldberg, 291 Mich. 401, 289 N.W. 192. We think, however, that an express averment is not necessary if other circumstances indicate that the affiant possesses the requisite competency. An affidavit of expert opinion has been held admissible only when made by an affiant with the necessary expert qualifications, Gloeser v. Moore, 284 Mich. 106, 278 N.W. 781; Baxter v. Szucs, 248 Mich. 672, 227 N.W. 666, and an affidavit containing inadmissible hearsay statements has been considered incompetent to the extent of the hearsay. Shea v. Leonis, 29 Cal.App.2d 184, 84 P.2d 277; Rosenthal v. Halsband, 51 R. I. 119, 152 A. 320. These rulings but serve to show that the courts look through the form to the substance of the matter presented, and that the real requirement is of proof which if presented at a formal trial would be competent to support the issues to which it is directed. When such proof is found in an affidavit presented in support of a motion for summary judgment, it should be considered even though the affidavit does not contain the then pointless offer of the affiant to submit to a cross-examination which will not be required if the affidavit is acceptable. Any other result would be as stultifying to this desirable summary procedure, as if we were to require the production of all witnesses at the hearing on the motion for the summary judgment as an earnest of their willingness to appear at a later trial.

 Plaintiff makes a further objection to the affidavit in that its exhibits are not attested as required by Federal Rule 44(a). This rule permits the introduction of a foreign official record "by a copy attested by the officer having the legal custody of the record, or by his deputy, and accompanied with a certificate that such officer has the custody." The certificate may be made by a vice consul of the United States stationed in the foreign country in which the record is kept. The statute, 28 U.S.C.A. § 695e, also states like conditions.

The secret decree and ministerial orders attached to Senor de los Rios' affidavit are evidenced by copies certified by Don Adolfo Sisto Hontan, Under Secretary of the Ministry of Finance of the Barcelona government. His certificate states that "the following Decree, which is to be found in the archives of this Ministry, was drawn up"

as he proceeds then to set forth. Hontan's signature and office are certified by Emilio Pavón, Sub-secretary of the Ministry of State; Pavón's signature and office are certified by Lee Worley, Vice Consul of the United States at Barcelona. In another certificate Vice Consul Worley attests that "each of ' the documents quoted in the certificates of Don Adolfo Sisto Hontan * * * was duly certified to by the said Don Adolfo Sisto Hontan who * * .* was the Under Secretary of the Ministry of Finance and was, as such, authorized by the Minister of Finance to sign each of the documents certified to by him; such Ministry of Finance being the lawful custodian of the original of each document."

This imposing array of certificates effected a sufficient compliance with Rule 44(a). The certificate of Don Hontan shows that the Ministry of Finance had the custody of the records in question; Don Hontan himself, as Under Secretary, adequately filled the role of an "officer having the legal custody." Chadwick v. United States, C.C. Mass., 3 F. 750, 756. The certificate of Vice Consul Worley does not expressly state that "such officer has the custody," as the rule requires, but it does state that the Ministry of Finance has the custody. The variation between the Ministry and its Under Secretary is unimportant. See New Mexico v. Texas, 275 U.S. 279, 297, 48 S. Ct. 126, 72 L.Ed. 280.

▌ But it is contended that Rule 44(a) and its corollary 28 U.S.C.A. § 695e are inapplicable, since they are intended to refer only to copies of original records that are on file in some public office and there available for examination by the opposing party. The original secret decree and ministerial orders are apparently not at present in any public office, and even when they were in the custody of the Ministry of Finance, they were secret and not available for examination by the plaintiff. But we do not consider these objections fatal. The rule speaks of "official" records, not "public" records. The use of the term "public" in the Advisory Committee's note to Rule 44 and in 28 U.S.C.A. § 695e may well have been merely as a synonym for "official." We see no necessity for reading into rule or statute a requirement that the original must be open to examination by the public. The faith placed in certified copies of official records is not based upon the assumption that the opposing party will detect forgeries and alterations, but upon the

assumption that the oath and certificate of the custodian may reasonably be relied upon. If this were not so, the elaborate requirements for certification of signature and office would be unnecessary, and any uncertified purported copy could be admitted so long as the opposing party could check it against the original in a public office. The rule suggested by plaintiff would undoubtedly make certified copies more trustworthy, but it is a rule neither required nor suggested by the rule and statute. It is not entirely inconceivable that a custodian of records will perjure himself and falsify documents, but the rule and statute reasonably presume that such will not often be the case. When forgeries do occur, proof of them will always be accepted. Until such proof is offered, official records should not be excluded from evidence because the possibility of forgery has not been completely foreclosed.

We therefore conclude that the affidavit with its attached exhibits was properly considered on the summary judgment motions in the various actions before us. Against its persuasive force, plaintiff has submitted very little. Plaintiff relies on three circumstances: (1) the presence on some of the crates of silver of the seals of communist labor unions; (2) the act of the Ambassador in personally and swiftly cashing the checks made out to him as payment to his government; (3) the certificate of Senor Cid, an official of the Ministry of Finance of the present Spanish government, that after minute investigation of all the offices of the Ministry of Finance of the former government he is unable to find any original document, entry, or record of the purported secret decree or ministerial orders.

The first two are relied upon as circumstances of suspicion indicating that improper, if not communistic, elements were in control of the situation in Spain, assuming to act in the right of the former Spanish government. However much these might be matters affording clues for investigation by the secret police of an interested nation, of themselves they do not rise to the dignity of competent proof of any sort to cast doubt upon the acts of the representative of an accredited government. And as to the certificate of Senor Cid—naturally limited to his own failure to discover an original record—the unsettled circumstances which we all know have existed during the revolution in Spain, the over-

throw of the former government and the substitution of a new régime for the old, make not unnatural disappearance of former original records if the Senor's certificate can be taken as showing their present non-existence. We think there is nothing in these three asserted facts which has a direct bearing upon, or casts doubt as to, the particular and detailed circumstances presented by the Ambassador. They are inadequate to show a genuine issue of material fact as to the existence of the original documents.

▪ The summary judgments were therefore appropriate if the court had jurisdiction of the actions.

II. *The Suability of Defendants.* The District Court held that the Federal Reserve Bank of New York and the United States Lines could be sued, notwithstanding their claim of immunity as agents of the United States, whereas the action against Solomon, the Superintendent of the United States Assay Office at New York, was in effect an action against the United States and hence would not lie. Defendants here reassert their immunity, as they are entitled to do, as an independent ground for affirming the judgment below. Helvering v. Gowran, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224. Plaintiff attacks a dismissal of the action in Solomon's case on the basis particularly of United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171, and other cases which have followed it, to the effect that an action for the possession of real and personal property may be brought against an officer of the United States in his capacity as an individual, even though he claims to hold the property for the United States, if he holds it unlawfully. Accordingly, we must turn to an examination of these authorities.

The exception to the general doctrine of governmental immunity from suit introduced by United States v. Lee, supra, has had an interesting history. It seems to depend exclusively on the form of action and to require for its operation a specific res held in the guise of public authority, but claimed by the plaintiff on the basis of a title superior to that of the sovereign. The idea is that a plaintiff may obtain his own property, real or personal, even from the agents of the sovereign itself. United States v. Lee, supra; South Carolina v. Wesley, 155 U.S. 542, 15 S.Ct. 230, 39 L.Ed. 254; Tindal v. Wesley, 167 U.S. 204, 17 S.Ct. 770, 42 L.Ed. 137; Poindexter v. Greenhow, 114

U.S. 270, 5 S.Ct. 903, 29 L.Ed. 185; Goltra v. Weeks, 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074; see Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525. On the other hand, an action cannot be maintained against a public officer who has done no more than breach a contract between plaintiff and the sovereign. Wells v. Roper, 246 U.S. 335, 38 S.Ct. 317, 62 L.Ed. 755; United States ex rel. Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191; Louisiana v. Jumel, 107 U.S. 711, 2 S.Ct. 128, 27 L.Ed. 448; see Tindal v. Wesley, supra, 167 U.S. at page 219, 17 S.Ct. 770, 42 L.Ed. 137. Nor will it apply to a tort other than one to recover property. Belknap v. Schild, 161 U.S. 10, 16 S.Ct. 443, 40 L.Ed. 599. In general the doctrine has not been applied where the sovereign or his agents do not hold a specific res. Cunningham v. Macon & Brunswick R. R. Co., 109 U.S. 446, 3 S.Ct. 292, 27 L.Ed. 992; International Postal Supply Co. v. Bruce, 194 U.S. 601, 24 S.Ct. 820, 48 L.Ed. 1134; Naganab v. Hitchcock, 202 U.S. 473, 26 S.Ct. 667, 50 L.Ed. 1113; Louisiana v. Garfield, 211 U.S. 70, 29 S.Ct. 31, 53 L.Ed. 92; Morrison v. Work, 266 U.S. 481, 45 S.Ct. 149, 69 L.Ed. 394; Cummings v. Deutsche Bank, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545; Minnesota v. United States, 305 U.S. 382, 386, 59 S.Ct. 292, 83 L.Ed. 235. In Haskins Bros. & Co. v. Morgenthau, 66 App. D.C. 178, 85 F.2d 677, certiorari denied, 299 U.S. 588, 57 S.Ct. 118, 81 L.Ed. 433, plaintiff was denied recovery of processing taxes paid into the United States Treasury pursuant to an alleged unconstitutional statute, even though the taxes were placed in an earmarked fund by the Treasury.

The last case indicates how shadowy may be the line of distinction. Indeed, it has been said that the doctrine of the Lee case, supra, was plainly an attempt to evade the rule of governmental immunity. Borchard, Governmental Responsibility in Tort, 36 Yale L.J. 757, 798, 802, 803. In Yearsley v. W. A. Ross Const. Co., 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554, the court stated the doctrine as limited to a case in which the officer or agent of the government exceeded his authority or the authority was not validly conferred.

The last line of distinction is the one suggested in the cases cited above, such as Wells v. Roper and Louisiana v. Jumel. It cannot be said to be entirely satisfac-

448

tory, for to a certain extent it begs the question in issue. But it is the one which has been used by the court, as in Poindexter v. Greenhow, supra, where an action of detinue was brought against a state treasurer for the recovery of personal property claimed to have been unlawfully seized and detained. To the treasurer's objection that he was only acting officially and the action was in effect one against the state, the court said (page 288 of 114 U.S., page 913 of 5 S.Ct., 29 L.Ed. 185), relying on United States v. Lee, supra, that "the ratio decidendi in this class of cases is very plain," that the defendant sued as a wrongdoer, justifying on the authority of the state, must "produce a law of the state which constitutes his commission as its agent, and a warrant for his act," that this the defendant tried to do, but could not because the law relied upon was invalid. "He stands, then, stripped of his official character, and, confessing a personal violation of the plaintiff's rights, for which he must personally answer, he is without defense."

Under the circumstances of this case, and in the light of our view that upon the facts of record the defendants' acts were lawful, the point now before us becomes a narrow one, indeed. It concerns only the form of the judgments to be entered in their favor. If a public officer or agent is acting lawfully, no judgment ought to be awarded against him and the question of whether he may be sued or not is academic. Actually here defendants have been sued for the purpose of determining whether or not their acts were lawful. The result of an affirmative answer may be stated to the effect that since defendants' acts were legal they cannot be sued because of their sovereign immunity, or it may be said that although they are suable no judgment may be had against them, since no wrong was done. In the case of the defendants in the two former actions, we believe the correct result is stated, as did the District Court, that they were suable. One was a common carrier sued for damages for making a claimed illegal disposition of the plaintiff's property. The other was an independent corporation which had obtained possession of the plaintiff's prop-

erty and allegedly had wrongfully disposed of it. Both were sued for damages. Judgment should go in their favor on the merits.

In the case of Solomon, however, the evasion of the ordinary rule of immunity seems too direct to be countenanced, for he was at most a mere custodian of the property for the United States. Under the law and the specific instructions given him in these particular instances, his duties were only ministerial. Here he was ordered to receive into his office the silver in question and to keep it there until he obtained directions from the Secretary of the Treasury otherwise. By law his duty is only to receive and safely keep funds of this sort until they are legally withdrawn. 31 U.S.C.A. §§ 273, 278, 281, 287. This silver was at all times under the direction of the Secretary of the Treasury. 31 U.S.C.A. §§ 251, 278. The Secretary, in turn, is required to issue silver certificates against the silver in a face amount not less than its cost. 31 U.S.C.A. § 405a. It is hard to see why the Secretary of the Treasury is not more directly the agent in charge of the silver than is the Superintendent of the Assay Office, or why the latter should be chosen before the guards or watchmen of the silver or the Acting Superintendent, who receipted for a part of it, as the means whereby governmental immunity is to be here dissipated. But even though Solomon had possession sufficient for suit if it was of a wrongful nature, our holding that the acts of the United States officials were lawful makes inapplicable the exception from immunity as that has been defined in the cases. There are, of course, sound arguments for reducing governmental immunity in tort, as is shown by the pendency of the present bill to provide at least a limited liability on the part of the government. Holtzoff, Tort Claims Against the United States, 25 A.B.A.Jour. 828; Borchard, State and Municipal Liability in Tort—Proposed Statutory Reform, 20 A.B.A.Jour. 747, with bibliography. But a result which requires the legislative process for its complete accomplishment is not advanced by expanding an exception of uncertain content and consequences.

Judgments affirmed.