## BERNSTEIN v. VAN HEYGHEN FRERES SOCIETE ANONYME.

No. 216, Docket 20521.

Circuit Court of Appeals, Second Circuit.

July 10, 1947.

Writ of Certiorari Denied Oct. 13, 1947.

See 68 S.Ct. 88.

CLARK, Circuit Judge, dissenting.

William S. Bennet and Bennet, House & Couts, all of New York City (Victor House, Bernard A. Finkel, and Sidney I. Liebowitz, all of New York City, of counsel), for appellant.

Stephen P. Duggan, Jr., and Simpson Thacher & Bartlett, all of New York City (Richard B. Persinger and Frederick B. Sussman, both of New York City, of counsel), for appellee.

The American Jewish Congress filed a brief for the appellant as amicus.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from an order, quashing a writ of attachment, and dis-

missing the complaint, in an action originally brought in the state court against the defendant, a Belgian corporation. The warrant attached a debt owed by another Belgian corporation to the defendant, which was served by publication completed on July 23, 1946. The defendant removed the case to the district court on August 10, 1946, and appeared specially to vacate the attachment and to dismiss the complaint. The complaint alleged that the plaintiff was the owner of all the shares of stock of a German corporation, commonly known as the "Arnold Bernstein Line," which in turn was the owner of a ship called the "Gandia." "In January 1937 the plaintiff was taken forcibly into custody by Nazis officials in Germany and imprisoned in a jail in Hamburg, Germany." During the time of his imprisonment he had reasonable cause to believe and did believe that the "said Nazi officials had designs on his life as well as liberty and business interests." At some time not stated these "Nazi officials" by means of duress and unlawful threats of bodily harm, indefinite imprisonment and death, as well as of business ruin, compelled the plaintiff to execute documents, which purported to transfer all the shares of "Arnold Bernstein Line" to one, Marius Boeger. Boeger took possession of all the assets of the Line, including the ship, which with its equipment, was "transferred to and taken into possession by the defendant, unlawfully and without fair and adequate consideration." Before the defendant came into possession and control of the vessel, it had learned that the plaintiff was a Jew and that he had been imprisoned, and for over two and one-half years had been at the mercy of "said Nazi officials" whose general policies of elimating so-called non-Aryans from German life, and confiscating their property were matters of general knowledge. The defendant also knew, or should have known that plaintiff had been compelled by threats of bodily harm, indefinite imprisonment and death, as well as business ruin, to execute the transfer to Boeger. This was the first count. The second count demanded damages for the detention of the vessel; the third was for the profits derived by the defendant from her operation; and the fourth was to recover the proceeds of insurance which the defendant had collected in July 1943, for the sinking of the vessel "in the early part of 1942."

The plaintiff, in opposition to the motion to vacate the attachment, filed an affidavit in which he alleged that "on January 25, 1937 I was arrested by the Nazi Gestapo, and from that day until the latter part of July 1939 I was continually in the custody of and imprisoned by the Nazis." He alleged that various charges were made against him during this time for violation of "certain German foreign exchange laws, and from time to time I was told and led to believe by Nazi officials, by my then attorneys in Hamburg and by others that unless I surrendered my shipping interests to a 'trustee' designated by the Nazis, I would be kept imprisoned indefinitely, my remaining property would be confiscated and my life and the lives of my immediate family would be imperilled." Further he alleged that he was a Jew, and that the Nazis were carrying on "a deliberate and openly avowed program of eliminating so-called non-Aryans from German social and economic life. I believed that I and my family were in real danger unless I acceded to Nazi demands, and I signed documents purporting to assign and transfer my ownership and control of the Arnold Bernstein Line to a Nazi designee, one Marius Boeger, * * * while still in prison." Even after he had signed these documents he alleged that he had not been released until July, 1939, when his friends paid a "ransom" and he was allowed to leave Germany. The affidavit concluded by alleging that he had later learned that the ship which was an asset of the Line, had been acquired by the defendant "from the Nazi 'trustee' in June, 1939"; that she had passed on time charter to the British Minister of War Transport during the war; had been sunk in 1942; that insurance amounting to 100,000 pounds had been paid for the loss; and that this had been collected by another Belgian corporation, which held it on the defendant's account. It was this debt against which the plaintiff levied the attachment. The judge quashed the attachment and dismissed the complaint upon the ground that the claim was for a wrong

done by "the German Government under the Nazi regime," and that, as the confiscation was within German territory, it was "not subject to review in our courts." The more important question on this appeal is whether the determination of the validity of acts of the German Government in 1937 is within the jurisdiction of a court of the State of New York; and preliminarily, whether the papers raise that question with sufficient definiteness at the present stage of the litigation to make a decision necessary. We will take these up in reverse order.

The New York Civil Practice Act [1] requires a plaintiff, if he would attach the property of a defendant, to "show that a cause of action * * * exists against the defendant"; and it is the New York law which determines the validity of attachments in the district court.[2] When the facts upon which the plaintiff's claim depends are in dispute, the courts of New York have been liberal in not requiring the plaintiff to present an unassailable case; and they have also examined his right in law with less jealousy than upon a motion to dismiss the complaint for insufficiency in law.[3] The controlling principle has been stated with some variations, among which the most extreme is that the papers must be "hopelessly bad," [4] if the attachment is to fail. However, the authoritative expression, we think, is that the attachment will not stand, if the papers upon which it "was based * * * clearly indicate that the plaintiffs must ultimately fail." [5] This, besides being the last word of the highest court, has been several times affirmed in the lower courts.[6] We accept it as our guide.

The plaintiff's allegations as to the defendant's notice of the duress which compelled him to sign the transfer, are exceedingly fragile, and would not survive challenge under a number of New York decisions. Nevertheless, we shall not dispose of the appeal upon the theory that he should have produced more persuasive evidence. After all, it is difficult upon an issue, whose support the party almost inevidently must draw from his opponent, to do much more than state circumstances from which an inference may be based; and we shall take it that the papers are enough in this respect. If so, there is no dispute about any of the facts except as to the meaning of the phrase, "Nazi officials," which recurs a number of times in the complaint and the plaintiff's supporting affidavit. Does that phrase in the context in which the plaintiff used it "clearly indicate" that the duress under which he acted was imposed by persons who were acting, or who purported to be acting, as officials of the Third Reich? Little can be added, we think, to the cogency of the language itself. The plaintiff does not explain what else he could have meant by the phrase; who else but an accredited agent of the government would have "imprisoned" him "in a jail in Hamburg"; or who else would have proceeded by means of a "Nazi designee" who later sold to the defendant. But that is not all. In his affidavit he swore that he "was arrested by the Nazi Gestapo and from that day * * * was continuously in the custody of and imprisoned by the Nazis"; that his pretended offence was the "violation of certain German foreign exchange laws"; and that Boeger was a "trustee," designated by the Nazis. Thus when called upon to clarify the meaning of his complaint the plaintiff left no question that he meant to allege that he had been a victim of that governmental persecution of Jews, which went so far to build up the universal execration of the regime.

The brief of the amicus argues that, even so, the acts of the "Nazis offi-

[1] § 903.

[2] Federal Rules of Civil Procedure, rule 64, 28 U.S.C.A. following section 723c.

[3] Goldmark v. Magnolia Metal Co., 28 App.Div. 264, 51 N.Y.S. 68.

[4] Guarantee Savings Loan & Investment Co. v. Moore, 35 App.Div. 421, 54 N.Y S. 787; Jones v. Hygienic Soap Granulator Co., 110 App.Div. 331, 335, 97 N.Y.S. 104.

[5] Wulfsohn v. Russian Socialist Federated Soviet Republic, 234 N.Y. 372, 377, 138 N.E. 24, 26.

[6] Romeo v. Garofalo, 25 App.Div. 191, 49 N.Y.S. 114; Severnoe Securities Corporation v. Westminster Bank, Ld., 214 App.Div. 14, 210 N.Y.S. 629; Bard-Parker Co., Inc., v. Dictograph Products Co., Inc., 258 App.Div. 638, 17 N.Y.S.2d 588.

cials" were unlawful under the laws of the Reich itself, because it is consistent with the record that they may have forced the plaintiff to transfer the shares before December 1938, and it was only in that month that any laws were passed, legalizing the confiscation of the property of Jews because of their race or religion. However, even though we assume that a German court would have held the transfer unlawful at the time it was made, that would be irrelevant. We have repeatedly declared, for over a period of at least thirty years, that a court of the forum will not undertake to pass upon the validity under the municipal law of another state of the acts of officials of that state, purporting to act as such.[7] We have held that this was a necessary corollary of decisions of the Supreme Court,[8] and if we have been mistaken, the Supreme Court must correct it.

■■ Thus the case is cleared for the second question: whether since the cessation of hostilities with Germany our own Executive, which is the authority to which we must look for the final word in such matters, has declared that the commonly accepted doctrine which we have just mentioned, does not apply. Before examining the evidence put forward in support of this position, it will clarify our discussion, if we say what we understand to be the general law on the subject. We assume that no court will apply, indeed it might be argued that none can apply, any law save that of the government of which it is a part.[9] A priori it would have been possible, when a transaction occurs elsewhere, for a court to shape the resulting rights and liabilities as though the transaction had occurred within the territory of the court's own government. That would of course not mean that in so doing a court would deny the fact that the transaction in the place where it occurred had created other rights and liabilities, but merely that for reasons of its own the state of the forum gave other rights and imposed other liabilities which seemed to it just. And indeed it is a well-settled exception to the usual doctrine that a court of the forum will take as its model the rights and liabilities which have arisen where the transactions took place, that the foreign rights and liabilities must not be abhorrent to the moral notions of its own state.[10] We may assume that the same is true of a defence to an obligation which under the law of the foreign state would otherwise have been there enforceable. If so, it would be possible in the case at bar for a court of New York to treat as a nullity the transfer of the plaintiff's shares upon the ground that its legal effect—depriving the plaintiff of property otherwise recognized in Germany itself—was utterly odious to the accepted standards of justice of that state. Hence, if in 1937 it had been the law of the Third Reich that any private person might seize a Jew and by threats of imprisonment or by torture force him to transfer his property, by hypothesis no court of New York would recognize such a transfer as affecting the victim's title, and, if the spoliator came to New York with the property in his possession, the victim could reclaim it. We will moreover assume for argument that anyone who knew how the spoliator had acquired the property would be in like case. The case at bar is indeed a variant of this, because the property of which the plaintiff has been despoiled, never came to New York; nor has the spoliator or his transferee; but we shall treat this difference as irrelevant. Therefore, the plaintiff's difficulty lies, not in any defect in the law of New York as to conflict of laws; but because of that other doctrine which we have mentioned: i. e. that no court will exercise its jurisdiction to adjudicate the validity of the official acts

---

[7] Hewitt v. Speyer, 2 Cir., 250 F. 367; The Claveresk, 2 Cir., 264 F. 276; Banco de Espana v. Federal Reserve Bank, 2 Cir., 114 F.2d 438; Union Shipping & Trading Co. v. United States, 2 Cir., 127 F.2d 771, 774; United States ex rel. Steinvorth v. Watkins, 2 Cir., 159 F.2d 50, 51, 52; United States ex rel. Von Heymann v. Watkins, 2 Cir., 159 F.2d 650, 652, 653.

[8] Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456; Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726.

[9] Restatement of Conflict of Laws, § 5 Comment (a); § 7(a) Comment (b).

[10] Restatement of Conflict of Laws § 612(a).

of another state. This the plaintiff acknowledges as generally true, but he says that it presupposes that the state of the forum has not acted to relieve its courts of restraint upon the exercise of their jurisdiction; and that our own government has already so acted. This is the remaining and the critical issue in the case; and we have to examine what those actions have been.

On June 5, 1945, the four victorious powers issued a "Declaration," by which they did "assume supreme authority with respect to Germany, including all the powers possessed by the German Government, the High Command and any state, municipal or local government or authority."[11] On August 2, 1945, the "supreme authority," so constituted, was vested in the four commanders-in-chief "each in his own zone of occupation, and also jointly in matters affecting Germany as a whole, in their capacity as members of the Control Council"; and it was enacted that "all Nazis laws which provided the basis of the Hitler regime or established discrimination on the grounds of race, creed, or political opinion shall be abolished. No such discriminations, whether legal, administrative or otherwise, shall be tolerated."[12] (It will be noted that this not only speaks in futuro, but presupposes the continued existence of such laws until their abolition.) Power to pass such a law had already been given by Article 13(b) of the "Declaration" of June 5th. The "zone" assigned to the United States did not include the territory in which the transfer to Boeger had been made: that was in the British "zone," and we have not had access to the laws which the commander-in-chief of the British "zone" may have promulgated under the separate authority vested in him by the language we have quoted. No order or law has been passed by the "Control Council" "jointly" so far as we can find which assumes to affect the legal incidence of transactions occurring in Germany.

We proceed first to consider our own legislation in the United States "zone." "Article II" of Law No. 1 provided that "No German Law, however or wherever enacted or enunciated, shall be applied judicially or administratively within the occupied territory where such application would cause injustice or inequality * * * (b) by discriminating against any person by reason of his race, nationality, religious beliefs * * *" This was only prospective in its operation, as becomes even more manifest from § 5 of "Article III" which provided that "decisions" of German officials of every kind "applying National Socialist objectives or doctrines shall not be referred to or followed as authority for the interpretation or application of German law." However, the Military Government in our "zone" took early cognizance of causes such as the plaintiff's, and by an amendment of July 14, 1945, to § 2 of Article I of Law No. 52, provided that "Property which has been the subject of transfer under duress * * * is hereby declared to be equally subject to seizure of possession or title * * * by Military Government." The "property" intended was not confined to that held by Germans; on the contrary, it would have included the plaintiff's ship in the defendant's hands had it been in existence, and then in the "zone," for subdivision (f) of § 1 included the property of "Absentee owners of non-German Nationality, including United Nations * * *" It is apparent that this law, standing alone, did not provide a means of settling controversies such as that at bar; it was only a preliminary to a law which should make them justiciable in some court to be later designated or set up. The system so foreshadowed has apparently not yet been completely devised; no Restitution Law has received final approval, although progress has been made to that end. Nevertheless Law No. 52 makes it clear that it was contemplated that property transferred under duress by "Nazi officials" is to be sequestrated by the local authorities. It may be answered that Law No. 52 does not affect the case at bar, because the only "property" now in existence is the plaintiff's claim against the defendant which is a Belgian corporation; and that any claim against it cannot therefore be sequestrated

---

[11] "The Axis in Defeat" p. 63, Publication of the Department of State.

[12] "The Axis in Defeat" pp. 11 and 12, Publication of the Department of State.

by the action of any of the Military Governments, in spite of the fact that "property" is defined in Law No. 52—§ 9(c)—so as to include among other things "claims, obligations and other evidence of indebtedness." It is a perfect answer to this that, although the plaintiff speaks as the owner of the ship, strictly speaking he never owned her; he was only the owner of the shares of the "Bernstein Line"; and that was a German corporation, over which the power of sequestration (by the British Military Government at any rate) was unquestionable. However, we need even not rely upon that, because the only relevant consideration is how far our Executive has indicated any positive intent to relax the doctrine that our courts shall not entertain actions of the kind at bar; some positive evidence of such an intent being necessary. Certainly, it is no indication of such an intent, that although the Executive has provided for the adjudication locally of all controversies where for the most part they will arise, it has not accompanied this by the redundant declaration that in other cases the ordinary doctrine still obtains.

The necessity for maintaining that doctrine in all cases appears upon reflection. So far as any property wrongfully seized remains in the control of the German Government, or has been used or destroyed, claims for it will go into the account for reparations; or be otherwise dealt with in the peace treaty. What those claims will be, how they will be collected and what restitution will be given the victims are all obviously matters of international cognizance and must be left wholly within the control of our own Executive. It may at first blush appear that this is not true of property wrongfully obtained, and transferred to third persons, like the plaintiff's shares. Such property will not figure in reparations, so far as the victims get restitution from the transferees, as the plaintiff is seeking to do here. That might be a sufficient answer, if the matter were to end with any recovery in this action; but it would not; at least it would become a question for international determination. We are assuming that, as between the plaintiff and the defendant, the defendant's putative

notice of the duress by which the "Nazi officials" procured a transfer of the shares, would charge the defendant with its invalidity. Nevertheless, the defendant did act in reliance upon an act of the German government, or of its officials, whether or not it was authorized by existing German law. If the plaintiff succeeds, that reliance will have failed, and the defendant— a Belgian corporation—will have a claim against the Reich for its loss. It is quite immaterial whether that claim will prove valid in the end; we might even assume— though it would be quite unwarranted to do so—that the complicity of the defendant in the wrong would be answer to its claim against the Reich: e. g., that some doctrine would obtain akin to that of our own municipal law that there can be no indemnity between joint wrongdoers. It makes no difference how the defendant's claim came out, if it would present a claim, and obviously it would be absurd to deny that it would do so. That claim would have to be adjudicated as an item of the general claim for reparations against Germany; it could not be left to the decision of any other tribunals than those to which the ascertainment of reparations will be left. Moreover, since the defendant's claim—more probably, that of the Belgian government upon its behalf—would be measured by the plaintiff's recovery in the case at bar, the liquidation of the plaintiff's claim must also be treated as an item in the account against Germany. Otherwise, that account will be left pro tanto to the hazard of any court in any state which can obtain jurisdiction over any transferee. It seems to us that that is a consequence so at variance with the control which must be exercised jointly by the victorious powers in making peace, that only the most explicit evidence of a willingness so far to divest themselves, can support the action at bar. As we have tried to show, so far as has as yet appeared, the only evidence is directly the opposite.

All that we have said about our own legislation, is in a sense irrelevant, because the plaintiff transferred the shares in the British "zone," and it does not appear what laws the Military Government of that "zone" may have promulgated. Theoretically, it is possible to imagine that that gov-

ernment, as successor in its own territory to the Reich, has consented to allow controversies of the kind at bar to be determined wherever jurisdiction can be acquired. Remote as that possibility is, there are several answers to it. First, the "Control Council" was designed for joint action, and, although the powers have not in all respects acted in unison, so far as we are aware, the British and ourselves have been in substantial accord. Second, as we have just said, nothing but the most explicit expression would satisfy us that a practice so destructive of the underlying necessities of a treaty of peace, was contemplated.

Third, we are by no means ready to agree that, even if it appeared that the British Military Government had gone so far as would in our opinion be necessary, it would relieve a New York court from the need of an equivalent assent of our own Executive. It would not follow that we should join in the supposititious British consent, or that we were willing to have our courts avail themselves of it as to transactions, on which, had they occurred in our own "zone" we should not have allowed them to pass. Finally, the plaintiff nowhere suggests that the British Military Government has passed for its "zone" any legislation different from our own.

There remains only the plaintiff's argument drawn from the "Charter" and "Judgment" in the Nuremberg Trial, which is based upon the fact that both recognized as crimes "inhumane acts, committed against any civilian population, before or during, the war, or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated"—Article 6(c). The argument runs that, since we were a party to the prosecution, we recognized that a criminal liability would exist for a wrong such as the plaintiff has suffered; and it would be unreasonable to hold that a civil wrong did not exist as well. This we may accept arguendo; but it misses the point. In our discussion we have already assumed that, if the plaintiff had been despoiled by a private person in Germany in the way he was in fact despoiled, a New York court would not feel bound to concede the validity of the transfer, even though under the law of Germany it was valid. True, as we said, that is an extension of the usual doctrine that a court of the forum will not enforce a liability arising under a sufficiently repellant foreign law; nevertheless, we are assuming that it is a proper extension. Thus, it would not be necessary for a New York court to have recourse to the "Charter" or the "Judgment" in the Nuremberg Trial to ignore the transfer and to treat the plaintiff as the owner of the ship. Both the "Charter" and the "Judgment" are indeed necessary to support a criminal conviction before the "Tribunal," which was set up ad hoc; but by hypothesis they add nothing to the force of the plaintiff's position in the case at bar, for the transfer was invalid anyway.

On the other hand neither the "Charter" nor the "Judgment" aids the plaintiff in overcoming the real obstacle in his path; which is, not the absence of any substantive law—the law of New York—making the transfer invalid, but that no court of that, or any other state, is permitted to apply that law, since the claim is reserved for adjudication along with all other such claims as part of the final settlement with Germany. The fact that we acted as one of the prosecutors of the rulers of the Reich and in doing so asserted the existence of a criminal liability not to be found in any of its laws, has nothing whatever to do with the propriety of the district court's entertaining the action. In what we have said, we do not wish to be understood as positively holding that under the New York doctrines of conflict of laws, a New York court would decide as we have assumed; it is enough that even so it would not be justified in proceeding.

Finally, we see no reason to disturb that part of the order which dismissed the complaint. As it stands, the district court had no power to proceed; and, while it may not be proper, stricti juris, to say that it had no jurisdiction, that is a mere question of words. It is enough that the court was powerless to move in it.

Order affirmed.

CLARK, Circuit Judge (dissenting).

I agree with Judge HAND that the critical issue in the case is the last one he discusses, the only one, I take it, which he definitively determines against the plaintiff. As he formulates it, it is whether our government has "already" acted to relieve its courts of the traditional restraint upon the exercise of their jurisdiction to question acts of state of a foreign nation done within the latter's own boundaries. Perhaps it is appropriate thus to load the issue with a presumption or burden which must be overcome before acts of Nazi oppression can be questioned in our courts. Even so, I think it should also be wholly clear that all the authorities cited—which I accept fully on the points they decide—are based upon the condition that the foreign nation whose acts thus deserve our judicial respect was one to which our Executive accorded recognition as the de facto or de jure government at the time. Compare Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726; Banco de Espana v. Federal Reserve Bank, 2 Cir., 114 F.2d 438. Such recognition gave it the hallmark of legality so far as our courts were concerned. But those precedents do not deal with, or even appear to visualize, the situation where our Executive acts later to repudiate the recognition which it has granted and to declare the acts of that nation as wrongful and void, to be wiped out by a tremendous war effort and by acts of restitution and retribution at the war's end. Many things have happened since the days when Nazi Germany was the recognized government of German territory—so many and so important that we have no precedent to govern this case. In short, a new one must be formulated.

Now I do not think the case yet ripe for the definitive formulation of such a precedent; for a trial, if ordered, would clarify the facts and make the issues clear cut, as they are not on the present record. The only issue we need pass upon at this time is whether enough has been shown—or is within our judicial ken—to justify allowing the plaintiff a trial, rather than dismissing his case finally on this preliminary motion. I believe a trial should be had; and I think one of the first things the trial judge should do is to address a request to our State Department for a definition of executive policy in the premises. True, as we have found on previous occasions, the State Department officials may be wary of forthrightness to the point of determining or affecting already pending litigation. Even so, a negative or neutral answer might convey a certain amount of important information. Such an answer would at least show an absence of the policy which my brethren (quite curiously, as it seems to me) assume for our officials. That policy, as I understand it, is that only until there is "the most explicit evidence" of a willingness of the allied powers to divest themselves of a possible claim for reparations from the defeated for wrongs such as this will we have jurisdiction of this action. I do not see how the attitude of our allies may affect our jurisdiction directly; and in so far as it is one of the elements to be considered by our Executive in reaching a decision of policy, it concerns that high official, and not us. But if the supposition is to be relied on as making or increasing a presumption against this action, then I must suggest my own doubt of its rational basis. War seems to teach little permanently; I had thought, however, that the experience of World War I in the illusory character of reparations from a defeated enemy had destroyed all belief in their efficacy or possibility. For my part I have seen no suggestion that we were to exact such tribute from a defeated and prostrate Germany even if our economy were fitted to stand the shock of collection. Indeed the defendant does not suggest as much; it speaks only of the possibility of courts of restitution to be set up in Germany itself.

Further, the State Department could properly be asked to furnish a clear and precise recital of the various directives given to our representatives, military and civil, in Germany with regard to the invalidation of the Nazi laws as to Jewish oppression and the restitution of property to be made those despoiled. We have nothing like that before us now. True, the rather limited affidavits of the parties are supplemented by fairly full briefs so that, aided by the process of judicial no-

tice, we may perhaps have most of the relevant material before us. But of that fact we cannot be sure; and our interpretation of the data is likely to be as faulty as it is divergent. At any rate, the District Court, either with or without the aid of the executive officials, should be directed to make the complete inquiry which an order for a trial would entail.

As it stands, the opinion herewith draws certain conclusions as to our executive policy which I believe are subject to challenge because it (a) omits reference to various bits of relevant material accepted by the parties as at least being in existence and (b) gives a doubtful, if not erroneous, interpretation of the bearing and effect of the material discussed. Among the former is the original directive issued in April, 1945, to the Commander in Chief of the United States occupation forces in Germany, which stated as an allied objective the enforcement of a program of restitution to despoiled races and as a means toward that objective ordered impounded or blocked property taken through duress or confiscation, with the Commander to take "measures for prompt restitution" of such blocked property. J.C.S.Directive 1067, State Dept. Publication No. 2423, pp. 40-59. Also deserving of notice should have been the decree of the Military Government, "Law No. 1, Abrogation of Nazi Law," depriving of effect specified objectionable Nazi laws enacted since January 30, 1933, and containing a "General Suspending Clause" applying to all laws causing injustice or inequality by reason of discrimination on account of race or religion; the somewhat similar and more extensive "Law No. 1" of the Allied Control Council at Berlin, September 20, 1945, entitled, "Repealing of Nazi Laws"; and the various treaties of peace, signed or proposed, between this country and enemy satellite countries, requiring restitution of property confiscated for racial reasons, irrespective of any subsequent transfers. All such material is relevant for the light it offers as to American executive policy in the premises, irrespective of the direct or immediate application of such decrees or treaties to this particular defendant.

But even the material discussed seems to me to be interpreted according to a narrow legalistic formula of its inadequacy to overthrow the asserted presumption against jurisdiction, rather than on broad lines as pointing to the nature and purpose of the general executive policy. Thus, whether the particular decree or legislation may or may not operate in the territory where Bernstein was imprisoned in 1938 or 1939 or whether it is effective wholly to invalidate Nazi laws or is limited to prospective operation seems not decisive on its relevancy; in either case an executive policy determinative of this case would seem at least in process of formulation. Moreover, the steps taken or to be taken do not seem to me as tentative and halting as the opinion suggests. Some of the omitted material supports the contention that already the Nazi laws are officially considered invalidated and nugatory; and newspaper accounts of last March were to the effect that a law for tribunals of restitution had then already been drafted. A trial would show just what has taken place; it would deal with actualities at the time, and not rest so strongly on a heavy burden of presumption which, with deference, I must say appears to be based upon mere theorizing as to our possible attitude toward our defeated enemy. Nor does it seem important that the British may occupy the zone where Bernstein was, and may not yet have formulated their plans of restitution—no more important, in fact, than the hope of reparations still attributed to some of our allies. This all seems to partake more or less of guesses as to attitudes of other nations which, however pertinent for our policy makers, are irrelevant to our particular problem. As a matter of fact, however, our allies were one with us in fighting the greatest war in history which had as one of its objectives the repudiation of acts such as here alleged. But passing that, they have joined with us in many, if not most, of the steps aimed at the restoration of an earlier German economy; and in particular they joined with us in the prosecution of the Nazi chiefs at Nuremberg. I suspect that they, as well as our enemies,

may be mystified by what must seem the vagaries of a policy looking to restitution to the Jews in Germany at the same time that it accepts the acts of Nazi oppression of the Jews as binding in American courts.

Though I would not myself attempt a final decision at this time, yet the finality of my brothers' words compels me to say that if the policy of our Executive is one of nonrecognition of Nazi oppression and of restitution to the Jews I think we are bound to observe it in our courts. And all the indications I have seen so far tend to support a finding that such is the policy of the United States. Indeed, without a clear showing to the contrary, I should think the classic excoriation of the Nazi leaders for these very acts, among others, made by the American prosecutor at Nuremberg, must be accepted by us as the authentic voice of our Executive.