THE MATAWAN BANK, PLAINTIFF-RESPONDENT, v. THE
MATAWAN TILE CO. ET AL., DEFENDANTS-APPEL-
LANTS.

Argued March 21, 1949—Decided April 25, 1949.

118

*Mr. John E. Toolan* (*Mr. John E. Toolan,* attorney for the appellant Karl Mathiasen; *Mr. Lester C. Leonard,* attorney for the appellants Alfred Mathiasen et al.) argued the cause for the appellants.

*Mr. Jacob Steinbach, Jr.,* argued the cause for the respondent The Farmers and Merchants National Bank.

*Mr. Ralph S. Heuser (Messrs. Heuser & Heuser,* attorneys) argued the cause for the respondent The Matawan Bank.

The opinion of the court was delivered by

VANDERBILT, C. J.   The present appeal arises out of a decree of the former Court of Chancery surcharging the former directors of the defendant, The Matawan Tile Company, as a result of their administration of the affairs of the corporation during its voluntary dissolution.

The Matawan Tile Company was incorporated in 1902 for the purpose of engaging in the manufacture and sale of floor tile.   Over the years it acquired a sizable business in Matawan.   Although the company had withstood and recovered from the losses attendant on World War I, the shrinkage of business and profits during the 1930's seriously affected its financial condition.   With the advent of World War II, the classification of its business as a nonessential industry, the accompanying governmental restrictions on its operations, and the consequent losses, it early became apparent that the company could not survive.   Accordingly on December 2, 1942, at a special meeting of the board of directors a resolution was adopted recommending voluntary dissolution and at a special meeting of the stockholders on December 14, 1942, called for the purpose of acting upon the recommendation, dissolution was approved and the necessary written consents prescribed by the statute were executed, *R. S.* 14:13–1.   A certificate of dissolution, signed and attested by the president and secretary, was filed on December 15th with the Secretary of State, who issued his certificate of filing the same day.

At the time of the meeting on December 2d, the board of directors consisted of Bennet K. Eskesen, Eckardt V. Eskesen, Alfred Mathiasen, Karl Mathiasen and Peter A. Sondergaard.   For a number of years prior to the dissolution of the corporation, the active management of its affairs was chiefly in the hands of Bennet K. Eskesen as president and Alfred Mathiasen as secretary of the corporation.   On the occasion

of the stockholders meeting of December 14th, however, they presented their written resignations as directors and officers, to become "effective as of the date of the filing of the certificate of dissolution." Almost immediately following the filing of the certificate, they were employed by the remaining former directors, now trustees under the statute, *R. S.* 14:13–5, to take charge of winding up the corporate affairs at monthly salaries of $325 for Eskesen and $328 for Mathiasen.

The decision to liquidate the company had not been reached without efforts having been first made to interest new capital and, this failing, to sell the business as a going concern. New capital, however, proved unobtainable and the highest offer of purchase, amounting to only $45,000, was rejected. Although the corporation was then at the least on the verge of insolvency, the efforts of the directors to preserve the business or to dispose of it as a going concern did not cease upon dissolution but were, if anything, more vigorously pursued during 1943 and the early months of 1944, and doubtless would have continued indefinitely had not some of the creditors protested. With insignificant exceptions not the slightest attempt was made to liquidate the assets separately or in lots, even though there was machinery, office and other equipment, and stocks of steel, dyes, chemicals and other materials, all of which were in great demand and which would have brought a good return.

In this plan of salvaging the company, but without seeking the instructions of the court, the directors continued the operation of the business in much the same fashion as before the dissolution. After completing the few orders unfilled at the date of dissolution, new business was actively solicited and orders thus received were filled. Some relatively small quantities of bulk tile were manufactured for a period, but the major activity consisted of processing for sale at least one-third of a sizable inventory of bulk tile by pasting the tile in desired design and color—a finishing operation without which the tile was virtually unmarketable. The extent of the *post-mortem* enterprise may be measured in part from the fact that between December 15, 1942, and June 23, 1944,

gross sales approximated $40,000 and wages paid amounted to well over $20,000, not including the salaries received by Bennet K. Eskesen and Alfred Mathiasen which aggregated in excess of $8,000.

The depletion of the stocks of materials and supplies and the reluctance of the Reconstruction Finance Corporation to consent to the further postponement of payment of the indebtedness due it combined to slow manufacturing and processing operations in the latter part of 1943 and brought forth fresh efforts to raise new capital or alternatively to procure an advantageous price for the business as a going concern. Although no offers to purchase the plant exceeding $45,000 were obtained during 1943, the suit brought by the Reconstruction Finance Corporation in October, 1943, to foreclose the mortgages it held on the plant and equipment of the company was not pressed so as to permit still further exertions to be made. In February, 1944, an offer of $50,000 was received which was followed in the succeeding month by an offer of $60,000. After consultation with the Reconstruction Finance Corporation and one or two other creditors, including the complainant, the directors determined to submit the offer to the court for instructions.

Thus for the first time after more than a year and one-quarter of continued business operations subsequent to dissolution did the directors seek judicial direction, and then only because of the compulsion of surrounding circumstances. The petition for instructions was filed on April 14, 1944, by Karl Mathiasen as "surviving statutory trustee of Matawan Tile Company, in dissolution," Mr. Sondergaard and Mr. Eckardt V. Eskesen having died June 14, 1943, and December 13, 1943, respectively. The receipt of the $60,000 offer was set forth in the petition, together with the assertion that the book value of the plant, equipment and stock of inventory and supplies exceeded $220,000, and prayed for instructions as to whether or not the offer should be accepted and for an order fixing a time within which creditors should present their claims. In the meantime complainant on March 30, 1944, had filed its bill alleging the insolvency of the defendant

corporation at the time of dissolution and losses to creditors resulting from mismanagement by the directors during dissolution and seeking the appointment of a receiver and discovery and an accounting by the defendant corporation, and by Karl Mathiasen, Alfred Mathiasen and Bennet K. Eskesen, "the surviving trustees" of the company.

On the return of the show cause order issued on the petition for instructions, the court directed that the plant, inventory and supplies be sold at public auction. The sale was held on June 14, 1944, the property being first offered in lot and then in bulk, the highest bid received being a bulk bid of $60,000. The property was struck off to the high bulk bidder. After confirmation of the sale, Karl Mathiasen as surviving trustee filed his account and it was referred to a special master for audit. Meanwhile, the purchaser having paid the sale price, at the court's direction accrued taxes amounting to $5,964.15 were paid to the Borough of Matawan and the entire balance of principal and interest of the mortgage indebtedness owing to the Reconstruction Finance Corporation totalling $48,166.77 was satisfied.

Following the report of the special master, a petition was filed by The Farmers and Merchants National Bank, a creditor, charging the account of Karl Mathiasen to be incomplete and asking that all surviving directors and the personal representatives of the deceased directors be ordered to file a proper accounting to be thereafter referred to a special master. Exceptions to the account as filed by Karl Mathiasen accompanied the petition. A petition seeking similar relief was also filed by the complainant and exceptions were likewise taken to the account. Orders were thereupon made referring to a special master all matters in issue with full powers to conduct an inquiry into the management and operation of the affairs of the defendant corporation during dissolution and with directions to take an account thereof and to report to the court. Subsequently the two directors who had resigned and the personal representatives of the deceased directors were ordered to file accounts. Instead of so doing, all of them adopted as their own the account filed by Karl Mathiasen.

After extensive hearings the special master filed a comprehensive report wherein he found, among other things, that while the account of the directors as well as the records of the company's affairs for the dissolution period were incomplete, deficient and entirely inadequate, it was obvious that the corporate assets had been seriously depleted. Taking the position that the continuance of the manufacturing, processing, and sales activities after dissolution was beyond the powers of the directors, he recommended the imposition of a surcharge for losses resulting from business operations and for certain expenditures which he deemed improper. Accepting the view that the resignations of Bennet K. Eskesen and Alfred Mathiasen were ineffectual to relieve them of liability as liquidating trustees and presumably persuaded by the voluntary adoption of the account of Karl Mathiasen by Bennet K. Eskesen and Alfred Mathiasen and by the personal representatives of the deceased directors, the special master found that all three surviving directors and the estates of the two deceased directors should be held answerable.

At the time of dissolution on December 15, 1942, the total liabilities of the defendant company amounted to $94,615.45. Aside from the plant, machinery and equipment, tile inventories, and stocks of raw materials and supplies, the only assets consisted of cash on deposit of $720.55 and accounts receivable in the sum of $5,836.13. As of June 23, 1944, the company had a cash balance on hand from operations amounting to $5,261.13. While at first glance it would seem that the operation of the company had resulted in a profit, this cash balance does not reflect the value of the tile inventory and other supplies which had been used and *pro tanto* depleted, taxes and interest on the mortgages which had accrued during the period and were not paid, and the collection of almost the entire sum of accounts receivable and the absorption of the proceeds in the business. Thus it was quite evident that a substantial loss had been sustained. It being literally impossible to determine from the company records or the account filed by the surviving trustee the precise extent

of the loss suffered, the master recommended that the directors be charged with the following items:

(1) Cash on deposit as of December 15, 1942, amounting to $720.55, less accrued wage claims thereafter paid amounting to $444.83, leaving a net charge of $275.72;

(2) Taxes amounting to $4,058.24;

(3) Mortgage interest of $2,936.74;

(4) Collections on accounts receivable totalling $5,625.85, less an arbitrary collection credit of 30%, leaving a net charge of $4,085.29;

(5) The value of that portion of the tile inventory depleted, amounting to $6,650;

(6) The value of that portion of the other materials and supplies depleted, estimated at $2,000;

(7) Salaries paid to Bennet K. Eskesen and Alfred Mathiasen, totalling $8,441.89;

(8) Expenditures subsequent to the date of the account (June 23, 1944) and disapproved, amounting to $1,613.63.

From the gross surcharge which aggregated $30,061.51, there were allowed and deducted as credits the sums of $5,261.13, the cash balance on hand at the close of operations on June 23, 1944, being the amount by which receipts exceeded disbursements over the course of the eighteen month period after dissolution, and $1,250, representing the estimated overhead and other costs allocable to liquidation had liquidation been carried out immediately upon dissolution, leaving a net surcharge of $23,550.38.

On the filing of the master's report with the court, numerous exceptions were taken by both sides. The learned Vice-Chancellor allowed one exception made to the granting of the arbitrary 30% credit on the collection of the accounts receivable, thereby increasing the surcharge on that item from $4,085.29 to $5,625.85, and disallowed all other exceptions. A claim by Bennet K. Eskesen, Alfred Mathiasen and the estate of Eckardt V. Eskesen for salary accumulations arising from services rendered by them as officers of the company prior to dissolution was left open in the master's report for determination by the court. These accumulations were the result of a so-called standby agreement entered into in or about 1935, as a condition for the receipt of the loans from the Reconstruction Finance Corporation, whereby the officers

agreed to reduce their salaries and to accumulate the balances until the loans had been paid. This claim, amounting to $5,026.10, was disallowed by the learned Vice-Chancellor. In his opinion the agreement contemplated that the salary balances should be paid only in the event of the payment in full of the mortgage loans before dissolution and while the company was still solvent and to allow them after dissolution and insolvency would be unfairly prejudicial to the general creditors. In addition, the learned Vice-Chancellor concurred in the finding of the master to the effect that, although the directors had acted improperly in continuing to carry on the business of the company instead of proceeding with its liquidation, they had done so in good faith and without intentional fraud in the hope of preserving the business or salvaging as much as was possible through a favorable sale of the company as a going concern. He therefore denied the complainant's petition for the appointment of a receiver. A decree was thereupon entered in keeping with the findings of the special master as modified and supplemented by the conclusions of the learned Vice-Chancellor, and assessing costs, master's fees, and counsel fees against the three surviving directors and the estates of the deceased directors. From this decree the three surviving directors and the personal representative of the estate of Peter Sondergaard have appealed. No appeal has been taken by the estate of Eckardt V. Eskesen.

The voluntary dissolution of general business corporations is governed by the terms of *R. S.* 14:13-1 *et seq.* Under the provisions of this chapter, upon the issuance by the Secretary of State of his certificate of the filing of the dissolution papers "the corporation shall thereupon be dissolved * * * and the board of directors shall proceed to settle up and adjust its business and affairs * * *," *R. S.* 14:13-1. The directors are constituted the "trustees thereof, with full power to settle the affairs, collect the outstanding debts, sell and convey the property, and divide the moneys and other property among the stockholders, after paying its debts, as far as such moneys and property shall enable them * * *," *R. S.* 14:13-5. And the life of the corporation itself is prolonged,

being continued as a body corporate "for the purposes of prosecuting and defending suits * * *, of enabling them to settle and close their affairs, of disposing of and conveying their property and of dividing their capital, *but not for the purpose of continuing the business for which they were established.*" *R. S.* 14:13–4.

■ ■ It is firmly established in our law that, by virtue of the provisions embodied in this chapter, the property and assets of a dissolved corporation become a trust fund for the benefit of the creditors and stockholders to be administered by the directors as statutory trustees, *Fox v. Radel Leather Mfg. Co.,* 121 *N. J. Eq.* 291 (*E. & A.* 1937); *Trustees of Sea Isle City Realty Co. v. First National Bank of Ocean City,* 87 *N. J. Eq.* 84 (*Ch.* 1917). By express mandate of the statute the powers of the trustees in the administration of their trust extend only to winding up the affairs of the corporation and distributing its assets and to such other matters as may be necessarily incidental to the exercise of these functions. Manifestly, such grant of powers, even in the absence of the specific legislative proscription above quoted, does not contemplate the continuation of the business of the defunct corporation. Indeed, it is questionable whether the trustees are endowed with the power to perform executory contracts except so far as is necessary in the collection of the assets of the concern, *Note* (1927), 47 *A. L. R.* 1288, 1540. In these circumstances, and where as here the statute contains a plain and unambiguous prohibition against engaging in the business activities for which the dissolved corporation was established, it is a gross excess of the powers committed to the trustees for them to solicit or accept orders for products to be made by the corporation and to continue manufacturing and processing operations in order to perform such commitments. Such conduct, however well intentioned, constitutes a fraud on the statute.

■ ■ Except as it affects the amount of the trustees' liability, it makes not the slightest difference that here the manufacture of bulk tile from raw stock was of relatively small quantity and of comparatively short duration, the major

activity consisting of the processing of bulk tile, most of which was already on hand at the time of dissolution as part of a large inventory amassed during preceding years. Nor are we impressed with the contention that because the defendant corporation was established for the purpose of manufacturing *and* processing of tile for sale, the limited operations after dissolution were confined primarily to processing the inventory of bulk tile previously manufactured and therefore may not be characterized as perpetuating the business for which the company was established. The inescapable fact is that such activity was not at all consonant with winding up the corporate affairs and bore no necessary or reasonable relation thereto. Unless directed to the single statutory objective of winding up the affairs of the corporation, the trustees are forbidden to engage in carrying on all or any part of the business with which the company was formerly concerned. Here the directors frankly concede that their efforts were directed to preserving the company as a going concern, which is the diametric opposite of liquidation.

It is urged that having acted in good faith and having managed the corporate assets with care and prudence throughout, the directors are not accountable for resultant losses. Good faith and skillful and diligent management as found by the special master and the learned Vice-Chancellor are standards applicable where the trustees act within the scope of their statutory powers. When they take it upon themselves to go beyond those limits, they have committed a breach of their trust and act at their peril irrespective of the presence or absence of good faith and careful management. Any other rule would nullify the statute.

A breach of trust in which all trustees have participated or acquiesced renders all of them jointly and severally liable to their beneficiaries for the losses consequent thereon, *Windmuller v. Spirits Distributing Co.*, 83 *N. J. Eq.* 6 (*Ch.* 1914); 2 *Scott on Trusts* (1939), §§ 224, 258. So far as the defendants Bennet K. Eskesen and Alfred Mathiasen are concerned, we are compelled to conclude that their attempt to resign as directors was ineffective to relieve them of the

duties and obligations which the statute fastens upon the directors of a corporation from and after its dissolution. Their resignations, to take effect at the moment of dissolution, coupled with their subsequent continuation in active charge of the management of the corporation's affairs are a bald device to evade the responsibilities imposed by the statute, *Cf. Dubois v. Century Cement Products Co.*, 119 *N. J. Eq.* 472 (*E. & A.* 1936). In the case of the two deceased directors their estates are *prima facie* equally responsible with the surviving directors for the depletion of the corporate assets at least up to the time of their respective deaths. The personal representatives of the two estates, however, declined the opportunity given them to file separate accounts and voluntarily adopted the account filed by Karl Mathiasen, from which it was not possible to ascertain the condition of the corporate affairs as of the different dates of death. It necessarily follows that the three surviving directors and the estates of the two deceased directors are jointly and severally liable for the full surcharge, *Cf. Windmuller v. Spirits Distributing Co.*, 83 *N. J. Eq.* 6 (*Ch.* 1914), *supra*.

■■ It is also argued in effect that the bases upon which the master founded his calculation of the charges against the defendants were arbitrary and speculative. There is little, if anything, in the record to substantiate this contention. These defendants overlook the fact that it is the primary obligation and burden of the trustees to account for all the assets of the trust estate which come into their possession in the course of their stewardship. If, as here, they fail to carry this burden, they will be held personally responsible for the full value of such of the assets as are not satisfactorily accounted for. On the other hand, there should be credited against the surcharge the difference between the price at which the plant was actually sold and the price which would have been obtained had it been sold immediately or shortly after dissolution. The uncontradicted evidence shows that the plant was offered for sale as an entire unit through numerous brokers during 1942 and 1943 and that the highest offer received was $45,000. The final offer of $60,000 tendered in

1944 was the precise sum for which the plant was struck down at the public sale ordered by the court below. It may be fairly assumed, therefore, that the value of the plant appreciated in the amount of $15,000 between the date of dissolution and the date of the sale. The failure of the directors to liquidate immediately having resulted in this benefit, they are entitled to credit it *pro tanto* against the losses otherwise sustained.

Although it is recognized that the employment of an officer and a director to conduct the liquidation of a corporation in voluntary dissolution at a fair and reasonable salary may be sound business policy and entirely proper under certain conditions, *Bisbee v. Midland Linseed Products Co.,* 19 *F.* 2d 24 (*C. C. A.* 8th, 1927); *certiorari* denied, 275 *U. S.* 564, 48 *S. Ct.* 121, 72 *L. Ed.* 428 (1927), where the employment is for the purpose of carrying on the business activities of the concern in contravention of the statute, the remuneration paid therefor by the trustees cannot be allowed as a proper expenditure. Inasmuch, however, as the directors in the present cause were guilty of neither intentional fraud nor bad faith, they are entitled to apply for and to be granted compensation by way of an allowance for such of their services as related to the liquidation, as distinguished from the operation of the business, during the period of their administration as trustees.

The decree of the former Court of Chancery will be modified accordingly and, except as so modified, affirmed, and the cause remanded to the Chancery Division of the Superior Court to be disposed of in a manner not inconsistent with this opinion.

*For modification*—Chief Justice VANDERBILT, and Justices CASE, HEHER, WACHENFELD and BURLING—5.

*Opposed*—None.