**REPUBLIC OF ITALY v. DE ANGELIS et al.**

No. 123, Docket 22519.

United States Court of Appeals, Second Circuit.

Argued Dec. 5, 1952.

Decided Jan. 20, 1953.

On Petition for Rehearing Aug. 11, 1953.

122

Edward Garfield, New York City (Robert H. Wrubel, New York City, of counsel), for appellant.

Hahn & Golin, New York City (Alfred W. Bressler, New York City, of counsel), for defendants Anthony and Virginia De-Angelis, doing business as the DeAngelis Packing Co.

Before SWAN, Chief Judge, and CHASE and CLARK, Circuit Judges.

CHASE, Circuit Judge.

In November 1948, The DeAngelis Packing Company, a partnership composed solely of Anthony DeAngelis and his wife Virginia, owned a new meat packing plant at North Bergen, New Jersey. That company, to be hereinafter called the partnership, then leased the plant for a term of ten years to The DeAngelis Packing Company, Inc., a New Jersey corporation which had been recently organized to engage in the business of processing and packing meat, including the refining and processing of tallow of which 1,000,000 pounds per week could be rendered. Anthony DeAngelis, the controlling stockholder, was the president and duly authorized agent of the corporation during the time in which the events took place with which this appeal is concerned. The corporation for a while did an exten-sive business, its sales of its products for approximately one year immediately preceding December 1, 1950 being in excess of $28,000,000. Adolf Gobel, Inc., is a New York corporation which during the period here involved was also engaged in the meat packing business and will be referred to as Gobel.

In September 1950, the corporation executed three contracts with a representative of the plaintiff, The Italian Technical Delegation, to be now called the plaintiff, under which the corporation sold to the plaintiff 3900 tons of nonedible tallow for delivery in October, November and December of that year. In November 1950, the corporation in the same way sold to the plaintiff an additional 1500 tons of tallow for delivery during December 1950 and January and February 1951. None of the tallow was delivered except 300 tons in October 1950; and the plaintiff, as a consequence of the failure of the corporation further to perform its contracts, was obliged to purchase tallow on the market to the extent to which the corporation defaulted, and the market prices which it had to pay exceeded the contract prices by more than $800,000. It purchased a large quantity of this tallow from Gobel.

In April 1950, DeAngelis purchased enough Gobel stock to give him control of that corporation. He financed the purchase by borrowing $325,000 from the Public National Bank & Trust Company of New York; and the stock he bought, together with other collateral of his, was deposited with the bank to secure the loan and his other obligations to the bank. At this time the bank also received the continuing guarantee of the partnership for all of De-Angelis' obligations to it both past and future.

In October 1950, the partnership cancelled the lease of the meat packing plant to the corporation and sold the plant, subject to outstanding mortgages, to Gobel. It received $225,000 in cash, four promissory notes totalling $90,000 and 260,000 shares of Gobel stock. On October 25, 1950, the partnership paid the bank $200,000 in reduction of the loan the bank had made to DeAngelis and pledged 185,000 shares

of its Gobel stock as security for its guarantee of his obligations to the bank. On November 24, 1950, the partnership pledged its remaining 75,000 shares of Gobel stock to certain trustees as collateral security for DeAngelis' and his wife's joint and several guarantee of the obligations of the DeAngelis corporation.

After DeAngelis acquired stock control of Gobel, it also borrowed from the same bank. Its obligation was guaranteed by DeAngelis; and the partnership did not, before his guarantee was given, cancel its continuing guarantee of his bank obligations.

A certificate for the dissolution of the corporation was executed on November 17, 1950 and duly filed in accordance with New Jersey law on December 29, 1950. It did no business thereafter.

Invoking the diversity jurisdiction of the court, the plaintiff filed a complaint in three counts against DeAngelis and his wife, individually and as co-partners, and Gobel to recover the damages it had sustained because of the breach by the corporation. The latter, having been dissolved pursuant to New Jersey law, was not made a party.

■ A warrant of attachment was granted under § 903, subd. 3, of the New York Civil Practice Act against the property of DeAngelis held by the bank and against the property of the partnership held by the bank and the trustees. The attachment against the property of the partnership was granted on a showing by the plaintiff that the partnership had assigned, disposed of, or secreted its property with intent to defraud its creditors, and also on the ground that it had fraudulently incurred obligations and made fraudulent transfers of its property within the meaning of §§ 273, 275, 277 and 278 of the New York Debtor and Creditor Law. The District Court later, on motion, vacated the attachment against the partnership's property, and it is from this order that the plaintiff now appeals. Such an order is appealable. Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A., 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206.

The only count of the complaint in which the partnership is named as a defendant is the second. It sets forth a claim that the partnership, Virginia DeAngelis, Anthony DeAngelis (named as a conspirator but not sued in this count) and Gobel, acting in concert, did wilfully and without justification induce the corporation to break its contracts with the plaintiff. It is also alleged that the partnership conspired with the above mentioned persons and the corporation to induce the plaintiff to enter into the contracts by means of fraudulent misrepresentations.

The court permitted the plaintiff in opposing the motion to vacate to supplement its allegations in the complaint with affidavits; and the facts, as above summarized, are taken from the record as thus made out by the plaintiff. The notice of motion stated six grounds, of which the third was: "The papers upon which said warrant of attachment was granted fail to show sufficient evidence of the participation by defendants Anthony DeAngelis and Virginia DeAngelis, co-partners doing business as DeAngelis Packing Company, in any wrongdoing in the second cause of action in the complaint." The motion was granted on that ground, which made it unnecessary to deal with the other questions presented. We agree.

■ Before a warrant of attachment may be granted under § 903 of the New York Civil Practice Act there must be more support for it than a complaint sufficient to state a cause of action against a defendant whose property the plaintiff seeks to attach. In addition to that there must be enough shown to establish *prima facie* the facts on which the plaintiff relies as the basis for his alleged cause of action. Ecco High Frequency Corporation v. Amtorg Trading Corp., Sup., 81 N.Y.S.2d 610, affirmed 274 App.Div. 982, 85 N.Y.S.2d 304.

Yet neither the allegations in the second count of the complaint nor the supplemental affidavits, either alone or together, show *prima facie* that the partnership, itself or in concert with others, fraudulently induced the plaintiff to enter into the contracts with the corporation or that it intentionally and unjustifiably induced the corporation to

break its contracts with the plaintiff. The only acts of the partnership that are shown are (1) the cancellation of the lease of its Bergen plant to the corporation and (2) the sale of that plant to Gobel. There is no evidence to show *prima facie* that Virginia DeAngelis knew of the contracts which the plaintiff had with the corporation. And even if it can be said that the partnership is chargeable with knowledge of their existence, there is nothing to show that the cancellation of the lease prevented the corporation from fulfilling the contracts. They were for the sale, not the rendering, of a quantity of tallow, and, for all that appears, the corporation was free to acquire the tallow needed for the sale by its purchase on the open market.

The District Court denied a motion to vacate an attachment on the property of Anthony DeAngelis on the ground that there had been a *prima facie* showing that DeAngelis induced the plaintiff to enter into the contracts by means of fraudulent misrepresentations. It is now urged that he was also acting on behalf of the partnership when he made the misrepresentations, and that the partnership was therefore in a conspiracy with him fraudulently to induce the plaintiff to make the contracts with the corporation. We are asked to infer that DeAngelis was acting on behalf of the partnership because the partnership was benefitted by his acts. It is argued that this benefit was realized because, since the corporation was being dissolved, the contracts would not be performed by it but were to be adopted by Gobel if they proved favorable and otherwise ignored. This advantage to Gobel was to inure to the benefit of the partnership, since it was prospectively a substantial owner of Gobel stock. However, the existence of contracts between the plaintiff and the corporation would certainly give Gobel no rights under those contracts on dissolution of the corporation. The plaintiff did ultimately buy a large quantity of tallow from Gobel, but there is nothing to show that the plaintiff was not free to buy tallow elsewhere or that Gobel could not have sold its tallow to someone else as advantageously. Since the acts of DeAngelis did not benefit Gobel, they

did not benefit the partnership; and there is, therefore, no basis for inferring that DeAngelis was acting on behalf of the partnership in procuring the contracts for the corporation.

It follows that the order vacating the attachment of the property of the partnership was not erroneous since, even though the plaintiff may eventually mend its hold, such basis for it as is shown by this record clearly indicated that, as against the partnership, the plaintiff must ultimately fail. Wulfsohn v. Russian Socialist Federated Soviet Republic, 234 N.Y. 372, 138 N.E. 24; Bernstein v. Van Heyghen Freres Societe Anonyme, 2 Cir., 163 F.2d 246.

Order affirmed.

CLARK, Circuit Judge (dissenting).

A major difficulty in the case has seemed to be, not a dearth of allegations, but a superfluity which has unfortunately served to dilute or conceal the strength of plaintiff's case. Cutting through all this mass, as well as some piddling quibbling by defendants over the contents of the record, I think the problem can be both clarified and simplified by disregarding peripheral claims in support of the attachment to concentrate upon a single dominant contention based upon facts here undisputed. That is, that Anthony DeAngelis, the dominating force in the partnership, The DeAngelis Packing Company, had the partnership cancel the lease on its important new packing plant to The DeAngelis Packing Company, Inc., a corporation he controlled, thus making it difficult or impossible for the corporation to carry out the contracts he had made for it to sell tallow to the plaintiff. These are the essential facts; they seem to me amply to justify the attachment under N.Y.C.P.A. § 903, subd. 3.

The objecting arguments, as I understand them, boil down to three: that the partnership was not responsible for Anthony's acts, that the corporation could have performed its contracts by purchasing the tallow for resale, and that no wrongful or fraudulent intent was shown.

Perhaps it may be convenient to consider the last point first, because I rather think

it colors the entire picture by suggesting that an aroma of possible good business judgment for the DeAngelis interests excuses the adverse consequences to the plaintiff. While the opinion does not explain the background, it appears that the DeAngelis corporation, notwithstanding its twenty-eight-million-dollar packing business in the year prior to December 1, 1950, was having financial difficulties. The partnership had recently built, on land owned by it, this modern and efficient meat processing plant, including facilities to refine and produce at least one million pounds of tallow and lard per week. So it had organized the packing corporation in 1948 and had leased the plant to it for ten years. Obviously this plant was a vitally important property of the partnership; so far as appears, this was its only fixed asset. Consequently something needed to be done to keep it productive. The means adopted was the acquisition of Adolf Gobel, Inc., and the various transfers to it recounted in the opinion.

From the DeAngelis standpoint this may have been wise business judgment and shrewd executive planning. Obviously it saved the partnership from the chances of having a white elephant on its hands in the shape of its vast new packing plant. But the point is that what may be wise business foresight to one may be intentional injury to another. What happened here, however the legal consequences may be viewed, was clearly intentional in the eyes of the law. Anthony DeAngelis knew the entire situation. When he put the DeAngelis corporation out of the new plant, he may have wanted only to benefit the partnership through the new Gobel business, but he knew of its potential effect upon the plaintiff's contracts. Quite possibly he may have hoped that Gobel could take and perform the contracts or that he could eventually pay the loss; but actually there was a loss to the plaintiff of more than $800,000, as the opinion points out, which must be held within DeAngelis' contemplation. Thus his act for the partnership was a direct and actionable interference with these contracts. Lamb v. S. Cheney & Son, 227 N.Y. 418, 422, 125 N.E. 817; Campbell v. Gates, 236 N.Y. 457, 460, 141 N.E. 914; The Poz-

nan, D.C.S.D.N.Y., 276 F. 418, 433. No malice is necessary; it is sufficient to establish liability that DeAngelis acted intentionally and without legal or social justification. Hornstein v. Podwitz, 254 N.Y. 443, 448, 173 N.E. 674, 84 A.L.R. 1; Campbell v. Gates, supra; 6 Corbin on Contracts 855 (1951). Whether additional labels, such as fraud, conspiracy, or what not, are to be added seems to me merely garnishment of the essential facts which are enough to justify holding partnership property until the wrong is judicially established. Bernstein v. Van Heyghen Freres Societe Anonyme, 2 Cir., 163 F.2d 246, 248, certiorari denied 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357.

Against this background the other objections seem to me to fall rather quickly. That this big packing concern disposing of its own tallow is suddenly prevented from having any to meet its obligations to plaintiff seems to me an intentional interference with contract relations not to be wiped out by the suggestion that market forays might produce the tallow. Surely it is unrealistic to expect that this concern, stopped by its enfeebled financial condition from fulfilling its contracts in the normal and easy manner, could suddenly accomplish this the hard way. From the allegations it is clear that this was impossible and that DeAngelis knew it.

So, too, it is difficult for me to see how DeAngelis can be said not to be acting for his partnership when he cancelled the lease on the partnership's fine asset in order to substitute a good tenant for a doubtful one. Surely this act for the benefit of the partnership could not be attacked for lack of authority by any of the immediate participants. Indeed, there is no suggestion of invalidity as to, say, the corporation or Gobel. But to say that this single indivisible act is the partnership's where it is beneficial, but that the partnership need not bear any of the burdensome consequences, seems to me strange. I suggest that the answer is clear under N.Y. Partnership Law, The Uniform Partnership Act, § 24: "Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, * * * loss or in-

jury is caused to any person, not being a partner in the partnership, .* * * the partnership is liable therefor to the same extent as the partner so acting or omitting to act." What more "ordinary course" may there be to a business than conserving its sole asset?

I would reverse.

### On Plaintiff-Appellant's Petition for Rehearing.

PER CURIAM.

█ In its decision, January 20, 1953, a majority of this court affirmed the order below dissolving an attachment against the defendant partnership's property because plaintiff had shown no *prima facie* claim that the partnership had intentionally and unjustifiably induced the DeAngelis corporation to break its contracts for the sale of tallow to plaintiff. Judge CLARK dissented on the ground that such a claim arose by virtue of the acts of DeAngelis for the partnership in selling to Adolf Gobel, Inc., the packing plant, owned by it and leased to the DeAngelis corporation, thus putting the latter corporation out of the plant. On petition for rehearing plaintiff stresses the obligation assumed by the partnership to Gobel to cause the DeAngelis corporation to be dissolved, with resulting inability to perform its executory contracts. We are all agreed, for reasons more fully developed in Judge CHASE'S opinion herewith, that this does constitute that showing of a *prima facie* claim which is necessary to sustain an attachment. Left, therefore, is the further question, not previously reached, whether there has been adequate showing that defendants have assigned or secreted their property with intent to defraud creditors.

█ Judge CHASE in his opinion sets forth in some detail the three transactions by the partnership relied on by plaintiff to satisfy this requirement. The opinion then holds that these transactions were fraudulent as to partnership creditors under N. Y. Debtor and Creditor Law § 277, McK.Consol.Laws, c. 12, and perhaps §§ 273 and 275, but that they were not such fraudulent conveyances as would justify an attachment under § 278(1) (b) of that law or under N.Y.C.P.A. § 903(3). Judge CHASE considers the latter statute controlling in interpretation of the former and the showing of an *actual*, as distinguished from a constructive, or other form of, intent to defraud, a requisite of the latter.

Judges SWAN and CLARK concur in Judge CHASE'S holding as to the existence of fraudulent conveyances, but do not agree with his further interpretation of the New York law. Since DeAngelis in the transactions in question was acting to benefit and protect the partnership and himself financially without necessary thought as to plaintiff's contracts with the DeAngelis corporation, it may be assumed that an actual and active intent to defraud this plaintiff is not shown. But we think it clear that under the attachment provision of the N. Y. Debtor and Creditor Law § 278(1) (b), and the decisions applying this statute, no showing of such an intent or one beyond the statutory requirements of §§ 273, 275, or 277 is required. And we conclude further on a considered analysis of the New York precedents that the same interpretation is to be made of N.Y.C.P.A. § 903(3). A more detailed exposition of this view appears in Judge CLARK'S accompanying opinion. The order below must therefore be reversed; the attachment will continue.

Order reversed.

CLARK, Circuit Judge (concurring).

This expression of views supporting and concurring in the reversal of the order dissolving the attachment is designed, I, to set forth the conclusions of Judge SWAN and myself upon the proper interpretation of New York law as to the requisite intent to defraud creditors on a debtor's transfer of property needed to sustain an attachment and, II, to add some further views of the writer in amplification of the conclusion that plaintiff has shown, at least *prima facie,* a tort liability of the defendant partnership for inducing a breach by the DeAngelis corporation of the latter's contracts for the sale of tallow to plaintiff.

## I.

In the three transactions relied on by plaintiff as showing fraudulent transfers, set forth in Judge CHASE'S opinion, it is obvious that DeAngelis was pledging or otherwise transferring assets of the partnership as a means of effectuating the transfer of his business interests to Adolf Gobel, Inc. As appears from our earlier opinions, this was a method of correcting the unfavorable financial position in which he found himself. In these steps, plaintiff's contracts for the purchase of tallow need not have figured largely, perhaps no more than that they should be ignored because of overriding exigencies arising from other quarters; at least there is here no showing—as there could hardly be by any stranger to the negotiations—that the corporate obligations to plaintiff were explicitly in DeAngelis' mind when he made the partnership transfers. Plaintiff argues that, since a person must be considered to intend the natural consequences of his acts, this must be held to constitute "actual" fraud; and in the long history of the law as to conveyances in fraud of creditors there is authority to this effect. See discussion and cases cited in 38 Yale L.J. 822, also statements such as that from Coleman v. Burr, 93 N.Y. 17, 31, quoted below. But there developed over the years a neater and perhaps more realistic approach, first through the use of presumptions and then of statutory equivalents to proof of actual intent. New York has been well supplied with such statutes, of which the important earlier ones are N.Y. Personal Property Law § 35, McK.Consol.Laws, c. 41, and N.Y. Real Property Law § 263, McK.Consol.Laws, c. 50, going back to legislation of 1829, R.S.(1829) pt. 2, c. 7, tit. 3, § 1, originally enacted in 1787, 1 Greenleaf's New York Laws 381-386, 2d Ed., and based on the English Statute of Fraudulent Conveyances, 13 Eliz. c. 5 (1571). These statutes were repealed in 1925 with the enactment of the Uniform Fraudulent Conveyance Act, N.Y. Debtor and Creditor Law §§ 270 et seq. The attachment statute, N.Y.C.P.A. § 903, goes back through the N.Y. Code of Civil Procedure § 636 to legislation of 1857, 2 Laws of N.Y. c. 723, pp. 554-555 (1857). The statutory authority for the present proceeding is therefore the uniform act and the attachment statute properly read together as parts of a related whole.

Judge CHASE, in conclusions with which we agree, holds the transfers fraudulent as to partnership creditors under § 8 of the uniform act, N.Y. Debtor and Creditor Law § 277, which declares: "Every conveyance of partnership property and every partnership obligation incurred when the partnership is or will be thereby rendered insolvent, is fraudulent as to partnership creditors," if made without fair consideration to the partnership. Allied provisions are § 273, making every such conveyance or obligation fraudulent as to creditors without regard to actual intent if made without fair consideration and rendering the maker insolvent, and § 275, making every such conveyance or obligation incurred without fair consideration fraudulent as to both present and future creditors when the maker intends or believes that he will incur debts beyond his ability to pay as they mature. We need not, however, consider the applicability of these provisions, since we are all agreed that the protection of § 277 extends to the plaintiff here; contrary to defendants' assertion, we hold that plaintiff was a creditor of the partnership (as that term is broadly defined by § 270) from the time of the partnership's tortious acts, which antedated the making of the fraudulent conveyances. Leifer v. Murphy, 149 Misc. 455, 267 N.Y.S. 701; Gatto v. Boyd, 137 Misc. 156, 241 N.Y.S. 626; Marcus v. Kane, 2 Cir., 18 F.2d 722.

The final relevant provision of the uniform act is § 9, N.Y. Debtor and Creditor Law § 278, which provides: "Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may * * * b. Disregard the conveyance and attach or levy execution upon the property conveyed." The provision of the attachment statute, N.Y.C.P.A. § 903, here immediately pertinent is the requirement that the plaintiff "must also show that the defendant * * * 3. If a natural person or domes-

tic corporation, has removed or is about to remove property from the state with intent to defraud his or its creditors, or has assigned, disposed of or secreted, or is about to assign, dispose of or secrete property with the like intent." The argument made on these enactments is that the "intent to defraud" of the attachment statute is an "active" intent; and since the uniform act cannot be thought to have added a new ground of attachment, the fact that a conveyance may be fraudulent as to the maker's creditors under the act is not sufficient to render it attachable, notwithstanding the quoted provisions of § 278(b). This argument we reject.

Consistent with its general purpose and construction—see 1 Glenn, Fraudulent Conveyances and Preferences 460 (Rev.Ed. 1940)—the cases have uniformly held that conveyances must be set aside without regard to actual intent when one or more of the provisions of the uniform act are satisfied. See, e. g., Sabatino v. Cannizzaro, 243 App.Div. 20, 275 N.Y.S. 677; Hearn 45 St. Corp. v. Jano, 283 N.Y. 139, 27 N.E.2d 814, 128 A.L.R. 1285; Feist v. Druckerman, 2 Cir., 70 F.2d 333. True, these are cases more directly dealing with the setting aside of such conveyances and we find no decision which as yet considers the question of attachment in the light of the provision of the N.Y. Debtor and Creditor Law § 278(b). But the attachability of the property under the same circumstances would seem clear not only because allowance of the lesser provisional remedy by reason and logic would seem to follow *a fortiori* from the grant of the greater and substantive remedy, but also because the statute expressly so says and any other holding would substantially nullify an important remedial enactment. And if there must be found necessary conflict between the two governing statutes, it would appear that in any event the later act should prevail both because it is later and clearer and because it is a uniform act which should be uniformly applied and not made subject to special exceptions in a particular state.

This conclusion is sufficient to require reversal of the order below. But we are unwilling to suggest so much confusion in the New York law; for we think the attachment statute in the N.Y. Civil Practice Act is properly construed as entirely consistent with the uniform act. The question has arisen because certain cases under the former have seemed to stress the requirement of actual intent. But these were cases where the "rules of evidence" or the presumptions which had developed under the statute of Elizabeth would not operate and hence are entirely natural and consistent with the analysis we are presenting. In J. H. Mohlman Co. v. Landwehr, 87 App.Div. 83, 83 N.Y.S. 1073, reliance for attachability was sought (but not upheld) in a failure to meet the formalities of the Bulk Sales Act. So in Casola v. Vasquez, 147 N.Y. 258, 41 N.E. 517, the court refused to infer an intent to defraud from the giving of a preference, not exceeding the value of the debt sought to be paid, noting that preferences were not fraudulent under the common law and that there was here no such fraud as was contemplated by the statute of Elizabeth and similar statutes. On the other hand, Lukens Iron & Steel Co. v. Payne, 13 App.Div. 11, 43 N.Y.S. 376, 378, holds actual intent to defraud not required where the statute voiding the conveyances "lay[s] down a rule of evidence by which their fraudulent character could be determined." There the statute, derived from the provisions of 2 R.S. 136, § 5 (1829) and Laws 1833, c. 279, cf. the former N.Y. Personal Property Law § 36, declared a chattel mortgage upon property the possession of which is retained by the mortgagor to be presumptively fraudulent and void unless it is filed. Schumann v. Davis, C.P., Gen. Term, 14 N.Y.S. 284, is to the same effect; and see also Vietor v. Henlein, Gen. Term, 1st Dept., 34 Hun 562, 564, and Citizens' Bank of Perry v. Williams, Gen. Term, 5th Dept., 59 Hun 617, 12 N.Y.S. 678, reversed on another point in 128 N.Y. 77, 28 N.E. 33.

These cases all point to the correct rationale which is made more explicit in the Payne case when it says that the provision for filing chattel mortgages "was introduced as an exception to the rule, which grew up under the statute of Eliza-

beth and is embraced in the Revised Statutes, that a paper transfer of title, secretly given, without change of possession, was prima facie evidence of a fraudulent intent to defraud the creditors injured thereby," citing the famous Twyne's Case, 3 Co. 80b (1601). Since Twyne's Case, the rule has been general that retention of possession upon a sale of goods is a badge of fraud. 1 Glenn, Fraudulent Conveyances and Preferences 605, 606 (Rev.Ed. 1940); see also the act for the filing of chattel mortgages, N.Y. Lien Law § 230, and the Sales Act, N.Y. Personal Property Law §§ 106, 107.

Any doubts as to the validity of this rationale which connects the traditional words of act "with intent to defraud" with the interpretation given the phrase in its source authority, the statute of Elizabeth, just as intimated in Casola v. Vasquez, supra, 147 N.Y. 258, 41 N.E. 517, should be put at rest by consideration of the consistent line of cases interpreting the fraudulent conveyances statutes in effect in New York before the adoption of the uniform act in 1925. These statutes used this same classic phrase, albeit in the more stately form of the English original—"with the intent to hinder, delay or defraud creditors"—see, e. g., the former N.Y. Personal Property Law § 35 and N.Y. Real Property Law § 263. In the actions to set aside fraudulent conveyances under these older laws, the courts uniformly held that no actual intent to defraud need be shown if fraud upon creditors was the natural and inevitable consequence of the conveyance. Coleman v. Burr, 93 N.Y. 17; Smith v. Reid, 134 N.Y. 568, 31 N.E. 1082; Cole v. Tyler, 65 N.Y. 73. A clear exposition of the applicable principles appears in the Coleman case, supra, 93 N.Y. 17, at page 31: "[T]he claim is made that here there is no finding by the referee of a fraudulent intent; but that on the contrary he has found the whole transaction to be fair and honest. He has, however, found facts from which the inference of fraud is inevitable, and although he has characterized the transactions as honest and fair, that does not make them innocent nor change their essential character in the eye of the law. Mr. Burr must be deemed to have intended the natural and inevitable consequence of his acts, and that was to hinder, delay and defraud his creditors."

An interpretation of the classic phrase, as used in its historic sense, in the attachment statute as well as elsewhere would seem therefore compelled by history and precedent; and such a conclusion would avoid the obvious anomalies of the contrary interpretation. Applying the law as stated in these precedents, there can be no question but that there was an adequate showing of the requisite intent to hinder or defraud.

II.

Although reversal here is adequately sustained by the conclusion, in which I concur, that dissolution of the DeAngelis corporation pursuant to agreement with Gobel constituted *prima facie* a tortious interference with plaintiff's contracts, yet the question of intent or possible "justification" for such interference has already loomed so large that I think some further amplification desirable to avoid misunderstanding.

First. I would express adherence to the view I have stated in my previous opinion of January 20 that such an interference occurred somewhat earlier on the partnership's transfer of its big packing plant to Gobel which operated to take away from the corporation its place and means of operation. The suggestion so vigorously pressed that this failing corporation, having its expected source of supply of tallow to fulfill its contracts with plaintiff thus destroyed, could nevertheless go out in the market and freely buy enough to take care of its burdensome obligations seems to me to rest upon a completely unrealistic appraisal of any actual possibilities. Interference with contract relations by making the promisor's performance more difficult, even though not absolutely impossible, is surely adequate for operation of the legal principle. 46 Col.L.Rev. 1039.

Second. It is desirable to place the question of intent and justification in correct perspective. Thus while there have been expressions suggesting that such interference with contractual relationships

is or must be "malicious," yet these are affairs of business competition where the matter of personal ill will is hardly important and the question must be rather——as pointed out below—one of "merely purposeful interference without justification." In fact a leading New York case states the principle succinctly and clearly thus: "[O]ne who, having knowledge of an existing valid contract between others, intentionally, knowingly, and without reasonable justification or excuse, induces one of the parties to the contract to breach it to the damage of the other party, is liable in an action to recover the damages suffered." Hornstein v. Podwitz, 254 N.Y. 443, 448, 173 N.E. 674, 675, 84 A.L.R. 1.

Perhaps the most useful and authoritative analysis of the subject is to be found in 4 Restatement, Torts, §§ 766 et seq. (1939), for which Professor Harry Shulman served as Reporter.[1] According to § 766, the wrong is done when one "without a privilege to do so, induces or otherwise purposely causes a third person not to * * * perform a contract with another." The comments illustrate the critical words and clarify the kind of intent requisite for liability. Thus Comment d, while stating that the rule "applies to any purposeful causation," continues: "It is not necessary, however, that the purpose to cause the breach of contract or failure to deal be the actor's sole or paramount purpose. It is sufficient that he designs this result whether because he desires it as an end in itself or because he regards it as a necessary, even if regrettable, means to some other end." And Comment m points out that "ill will" toward the person harmed

is not an essential condition of liability; the actor "may be liable even when he acts with no desire to harm the other." And as to the often cited requirement of malice it is said: "But the context and course of decision makes it clear that what is meant is not malice in the sense of ill will but merely purposeful interference without justification."

Later sections discuss the nature of the privilege which may excuse the otherwise tortious act. It is made quite clear that the situations suggesting a possible privilege do not give rise to an absolute right. Thus a privilege may be accorded a competitor, but competition does not necessarily justify the act, § 768; the outcome depends on an amalgam of several factors going to balance "the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand," § 767.[2]

This approach leaves room for differing results, but does avoid any arbitrary rule of thumb, permitting the courts to weigh the competing factors. Obviously the more direct and planned the interference, the more easily will the courts find liability. It is clear that the actor cannot excuse himself merely by showing he intended to benefit himself and had no ill will. In the present case, excuse is sought by reason of DeAngelis' own private needs for himself and his business, including his partnership. But so direct and so necessarily planned was the interference that the conduct, it would seem, is not to be excused. The timing of the various steps is rather conclusive. The first three contracts with plaintiff were made several days *after*

---

1. Other statements along similar lines appear in Harper, Interference with Contractual Relations, 47 N.W.U.L.Rev. 873; 6 Corbin on Contracts § 1470 (1951); Prosser, Torts 980–982 (1941); 46 Col. L.Rev. 1039. Professor Carpenter's article, Interference with Contract Relations, 41 Harv.L.Rev. 728, 745–762, first carefully analyzed the issue of justification in terms of internally flexible categories of "privilege" in a statement thus somewhat more complete than the still earlier article, Sayre, Inducing Breach of Contract, 36 Harv.L.Rev. 663.

2. "Whether a privilege of invasion exists depends upon whether it is of greater moment to society to protect the defendant in the invading activities than it is to protect and guard the plaintiff's interest from such invasions. An evaluation and balancing of the social import of the conflicting interests of the respective parties and of the social interests *per se* are involved." Carpenter, Interference with Contract Relations, 41 Harv.L.Rev. 728, 745. See also Bohlen, Incomplete Privilege to Inflict Intentional Invasions of Interests of Property and Personality, 39 Harv.L.Rev. 307, 314.

the partnership's negotiations with Gobel had led to agreement. That the agreement itself could become finally effective only upon approval by the Gobel stockholders, an event occurring shortly after the first three contracts with plaintiff were executed, does not change DeAngelis' earlier knowledge and intent. Knowing that he had made performance impossible, DeAngelis went ahead to make the contracts of sale by his corporation to plaintiff. The reason seems clear enough: the desire to make an offer attractive to Gobel. Hence Gobel could see a going and not a failing business to be acquired by the negotiations with the partnership, including the blotting out of the corporation.

It is true that a full trial may develop other and pertinent facts. But unless such trial will change the picture substantially, I think we should not indicate further basis or hope for the defense of justification. There is one more matter, namely, how far such matters of business justification gain strength because occurring through use of the device of the business corporation. Thus it is urged that stockholders may dissolve their corporation, in conformity with statute, without incurring liability for inducing the corporation not to perform its contracts. This is an interesting question; but there seems substantial authority upon it, and the overriding principles are not hard to state, whatever be the problems of their application. Indeed, one might deduce them from general propositions of corporate law; the corporate form of doing business is a useful instrument, but its abuse will be avoided by familiar devices, of which piercing the corporate veil is quite pertinent. So it is quite clear, and often reiterated, that directors, officers, and others interested in a corporation and acting in good faith *in the corporate interest* are not to be held for corporate actions which may constitute breaches of contract. See, e. g., Said v. Butt, [1920] 3 K.B. 497, 11 B.R.C. 317; Lukach v. Blair, 108 Misc. 20, 178 N.Y.S. 8, affirmed Lukach v. Reigart, 192 App.Div. 957, 182 N.Y.S. 935; Hicks v. Haight, 171 Misc. 151, 11 N.Y.S.2d 912, and other cases cited in the annotations in 26 A.L.R.2d 1270. But the cases indicate their own natural limitations. Actions at variance with corporate needs and for individual benefit are subject to the ordinary rule for tortious misconduct. A succinct statement is made by Mr. Commissioner (later Chancellor and Mr. Justice) Oliphant in Pennington Trap Rock Co. v. Pennington Quarry Co., 22 N.J.Misc. 318, 38 A.2d 869, 871: "The existence of a corporation should never be allowed to shield an individual who is in control of that legal fiction from the consequences of tortious acts maliciously ordered or directed by him to be done and perpetrated through that instrumentality."

Another often cited opinion, particularly valuable for its analysis of New York cases, is that of Judge Goddard in Vassardakis v. Parish, D.C.S.D.N.Y., 36 F.Supp. 1002, 1005; his decision upholds a complaint charging a corporation's general manager with inducing breach of plaintiff's employment contract with it. Judge Goddard agrees that an officer of a corporation "who, in good faith and believing it to be for the best interest of the corporation, seeks to have the corporation breach its contract with a third party, should be absolved from a suit of this character for the reason that his acts are not without justification." But after pointing out the allegations that here the officer was acting for his own interest against those of the corporation, he concludes that "it would be unconscionable to allow such a defendant to cloak himself with immunity merely because he was an employee or officer of the corporation."

This law is supported not only by the cases he cites, but by others. A notable decision by the learned and lamented Justice Shientag upholding such a complaint against a corporation's president is Morris v. Blume, Sup., 55 N.Y.S.2d 196, affirmed 269 App.Div. 832, 56 N.Y.S.2d 414. Another important case is that of Navarro v. Fiorita, 271 App.Div. 62, 62 N.Y.S.2d 730, affirmed 296 N.Y. 783, 71 N.E.2d 468, and approved in the note in 46 Col.L.Rev. 1039, against a corporation's general manager. See also Eisenberg v. Rodless Decorations, Inc., Sup., 106 N.Y.S.2d 822, 828,

per Mr. Justice Breitel, and cases cited in the annotation, 26 A.L.R.2d 1271.

On this statement of the law there would seem no doubt of the result which is indicated on this record. DeAngelis and his partnership were clearly and shrewdly acting in their own interest and letting the no longer useful corporation go hang. There is no benefit to the corporation to justify these acts, and liability therefore is tolerably clear on the facts so far disclosed.

For the sake of completeness I should add a word about the appealability of the order here in issue. The original opinion held an order vacating an attachment to be appealable under Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A., 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206, 19 A.L.R.2d 630. But that case was in admiralty; further, while the Court speaks of that as a collateral order, it nowhere cites or discusses the amendment to F.R.C.P., rule 54(b), effective in 1948. I prefer to put my vote in favor of appealability here on the operation of that amended rule; while the judge did not make a finding of finality in the very words of the rule, he did so in substantial effect, staying the operation of his order for the very purpose of this appeal. His intent being so clear, it would be bootless to send it back for a better formulation of the appeal formula. While some authorities suggest that so-called "collateral" orders are appealable in any event, see Moore's Federal Rules 1951, pages 253–255, there is considerable doubt as to what orders fall within this category, sometimes little more lucidly described as "offshoots" of the original case; one may perhaps query whether such direct safeguarding of the remedy as an attachment may not be thought something more than an "offshoot" of the original case.[3] At any rate we have treated such orders as within the compass of amended F.R. 54(b). See Lyman v. Remington Rand, 2 Cir., 188 F.2d 306; Phelan v. Middle States Oil Corp., 2 Cir., 203 F.2d 836.

The result is, as stated in the Per Curiam herewith, that the order dissolving the attachment will be reversed, and the attachment will stand.

CHASE, Circuit Judge (dissenting in part).

The majority of the court affirmed the order below on the ground that the appellant had failed to show, at least *prima facie,* that the partnership, as distinguished from DeAngelis individually, "intentionally and unjustifiably induced the corporation to break its contracts with the plaintiff." The ground for reversal now emphasized by the appellant is the effect of the clause in the contract the partnership made with Gobel which provided that DeAngelis would cause the corporation to be dissolved. It contends that the dissolution, so induced by the partnership, disabled it as a matter of law from performing its executory contracts with the plaintiff. We did not before deal with this question and will do so now, having had the benefit of additional briefs on that point.

In New Jersey, under whose laws the corporation was organized, the dissolution of a corporation is treated as a breach of its executory contracts because the corporation then lacks the ability to perform. It is equivalent to a breach by refusal of further performance. Bijur v. Standard Distilling & Distributing Co., 74 N.J.Eq. 546, 559, 70 A. 934, affirmed 78 N.J.Eq. 582, 81 A. 1132. In many other states the same view is taken of the effect of dissolution. See 16 Fletcher Corporations (Perm.Ed.) Sec. 8120, page 862 and cases there cited.

It is true, as the appellees have pointed out, that under the statutes of New Jersey corporations continue to exist for certain limited purposes and their directors, as trustees, are authorized "to settle the affairs, collect the outstanding debts, sell and convey the property", and perform "such other acts as shall be necessary to carry out the provisions of this title relative to the winding up of the affairs of the corporation and the distribution of its assets." N.J.S.A. 14:13–5.

Such continued existence of corporations,

---

**3.** Indeed, the Swift case suggests, 339 U.S. at page 689, 70 S.Ct. at page 865, that an order *upholding* an attachment is not collateral.

however, is for winding up purposes "but not for the purpose of continuing the business for which they were established." N.J. S.A. 14:13–4. We fail to find in the statutes of New Jersey anything to empower the dissolution trustee of this corporation legally to perform in its behalf its executory contracts with the plaintiff. On the contrary, upon the dissolution of the corporation its assets became a trust fund for the benefit of creditors and stockholders and the continuance by the trustees of the corporation's business would have been a fraud on the statute for which they might have been held personally accountable. Matawan Bank v. Matawan Tile Co., 2 N.J. 116, 65 A.2d 729.

Nor could they have performed the contracts merely by the delivery of tallow the corporation had on hand for that purpose. It did not have it. They would have had to purchase it on the market and either to have depleted a fund held in trust or to have created additional indebtedness so to get it. To do either would have been to act in excess of their powers. See 16 Fletcher Cyclopedia Corporations (Perm. Ed.) Sec. 8118. We are now satisfied that, for the reasons above stated, the appellant did make a *prima facie* showing that the partnership induced the corporation to breach its executory contracts with the appellant.

It may be, of course, that the dissolution of the corporation so induced was not an actionable tortious interference by the partnership with the appellant's contract relationship to the corporation. The appellee has argued that it was not because there was ample time for performance by the corporation before it was to be dissolved in compliance with the promise of DeAngelis in the partnership's agreement with Gobel; and also because any resulting interference was privileged in that it was but incidental to the bona fide acts of the partnership for the protection of its property rights. But, though justification may eventually be shown, it is a defense which the partnership must prove. Aikens v. Wisconsin, 195 U.S. 194, 25 S.Ct. 3, 49 L.Ed. 154; Advance Music Corp. v. American Tobacco Co.,

296 N.Y. 79, 70 N.E.2d 401. For the foregoing reasons we have now concluded that as the papers on which the attachment were based do not show that the plaintiff "must ultimately fail" to establish its cause of action as alleged they are sufficient for present purposes. See Bernstein v. Van Heyghen Freres Societe Anonyme, 2 Cir., 163 F.2d 246, certiorari denied, 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357.

This brings us to the additional questions which we did not reach before. They are whether the attachment is sustainable under Section 278(1)(b) of the New York Debtor and Creditor Law and whether the appellant's moving papers, having shown *prima facie* a cause of action for money damages only, also show that the partnership assigned, disposed of or secreted partnership property with that kind of intent which will justify the granting of an attachment under § 903(3) of the New York Civil Practice Act.

In denying the motion on the ground that no cause of action against the partnership had been shown, the District Judge did not have occasion to deal with these questions either; but as the facts appear exclusively from the moving papers without the testimony of witnesses who were seen and heard by him we are in as good a position as he to determine what they are.

On such a motion like this, the papers on which the attachment was allowed are to be liberally construed and all fair inferences from the facts as stated are to be drawn in support of the attachment. United States v. Brown, 247 N.Y. 211, 160 N.E. 13; Stewart v. Lyman, 62 App. Div. 182, 70 N.Y.S. 936.

The pertinent facts thus shown are that after the sale of the North Bergen plant to Gobel, 75,000 shares of the Gobel stock which were part of the purchase price received by the partnership were pledged as collateral security for the payments of the debts of the DeAngelis corporation which DeAngelis and his wife had previously guaranteed individually but for which the partnership had not been a guarantor. This was a voluntary pledge without consideration.

The partnership had given a bank a continuing and unlimited guarantee on all the obligations of DeAngelis individually with, however, the reserved right to terminate it by notice so as to cut off any liability for obligations incurred after the notice was given. On October 30, 1950 DeAngelis gave the bank his own unlimited and continuing guarantee of Gobel's debts to the bank which later came to be in excess of $800,-000. No notice of the termination of the guarantee by the partnership of the obligations of DeAngelis was given before Gobel's obligations were thus guaranteed by DeAngelis.

On October 25, 1950, $200,000 of the cash received on the sale of the plant was used to reduce a debt DeAngelis personally owed the bank. Then, or at least before December 1, 1950, all of the remainder of the proceeds of the sale, except $25,000, were pledged to the bank as additional security for its before mentioned guarantee of the obligations of DeAngelis.

These dispositions of the partnership property which were made when there were partnership creditors, were all voluntary, and in the absence of some proof to the contrary it is to be presumed, under New York law, that the transferor was insolvent. Cole v. Tyler, 65 N.Y. 73; Kerker v. Levy, 206 N.Y. 109, 99 N.E. 181; Ga Nun v. Palmer, 216 N.Y. 603, 111 N.E. 223. In this way the moving papers sufficiently show that conveyances as defined in Section 270 were made which were fraudulent as to partnership creditors under Section 277 of the New York Debtor and Creditor Law. The appellant insists that such conveyances were also made fraudulent by sections 273 and 275 of that statute, but if so their fraudulent character arose by virtue of a presumption of law just as in section 277 and fraudulent conveyances under section 277 will serve present purposes as well as would those under the other two sections.

I am not satisfied, however, that the attachment can be supported under Section 278(1)(b). That did not add a new ground for attachment to those in the Civil Practice Act. This subsection is concerned with the rights of creditors whose claims have matured and gives such a creditor "as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser" a choice of remedies.

Where a conveyance or obligation is fraudulent as to him he may proceed in equity to have it set aside or annulled to the extent necessary to satisfy his claim or disregard the conveyance and sue at law. If he sues at law, by hypothesis, there has been no conveyance and he has the same right to attachment or levy of execution that he would have had, but for the conveyance, on the property in the hands of his creditor. Cf. American Surety Co. v. Conner, 251 N.Y. 1, 166 N.E. 783, 65 A.L. R. 244.

Nor do I think that the weight of authority in New York is to the effect that the attachment was authorized by section 903 (3) of the Civil Practice Act. Its predecessor was section 636(2) of the Code. The intent to defraud creditors which must be shown to support an attachment under this section is one characterized by *mala fides*. As was said in J. H. Mohlman Co. v. Landwehr, 87 App.Div. 83, 86, 83 N.Y.S. 1073, 1075, "The weight of authority in this state is to the effect that the provisions of the Code [§ 636] in this regard relate to a moral, rather than to a constructive, fraud. Belmont v. Lane, 22 How.Prac. 365; Milliken v. Dart, 26 Hun 24; Casola v. Vasquez, 147 N.Y. 258, 41 N.E. 517. In other words, there must be an actual or intended fraud in order to authorize an attachment, and not merely one declared to be such by statute because of the omission of certain specified formalities." And in Casola v. Vasquez, supra, 147 N.Y. at page 260, 41 N.E. at page 518, the statement of what is required is that "to authorize an attachment under subdivision 2 of section 636 of the Code, there must be actual or intended fraud upon creditors; such fraud as was contemplated by the statute of Elizabeth and similar statutes."

The appellant relies on cases, of which Vietor v. Henlein, 34 Hun 562; Citizens Bank v. Williams, 59 Hun 617, 12 N.Y.S.

678; Luckens Iron & Steel Co. v. Payne, 13 App.Div. 11, 43 N.Y.S. 376, and Schumann v. Davis, Com.Pl., General Term, 14 N.Y.S. 284, are examples, in which motions to vacate attachments based on the fraudulent transfer section of the attachment statute were denied. In some the circumstances shown justified an inference that the transfers were made with actual intent to defraud and in so far as they indicate that only intent to defraud based on a presumption of law is enough I do not think they accord with the weight of authority in New York. Cf. V. G. Pfluke Co. v. Papulias, 42 Misc. 15, 85 N.Y.S. 541.

We have already held that the moving papers do not show that DeAngelis was acting on behalf of the partners in the procurement of the tallow contracts. Its part in the events which led up to the breach of the contracts was a sale of the partnership plant to Gobel for a fair consideration, the contract for that sale providing for the dissolution of the DeAngelis Corporation. If actual fraud by the partnership is shown by the papers it is in that the proceeds of the sale were used to reduce a debt of one partner of which the partnership was already the guarantor, to add to the collateral security it had already pledged on its guaranty of that partner's personal obligations and, by failing to give notice to prevent it, to permit him to increase his personal obligations by becoming the guarantor of the obligations of Gobel, a corporation in which the partnership was a substantial stockholder. At the time the proceeds were so used there had been no default on the tallow contracts and there was nothing due and owing by the partnership to the appellant and that there ever would be lay in the uncertain lap of the future as, indeed, it still does.

In the circumstances here shown the use of the proceeds of the sale to reduce a debt the payment of which it had already guaranteed and to aid a corporation in which it had a substantial stock interest are too indicative of an intent to take advantage of a proper business opportunity to support an inference that they were prompted by an evil purpose to defraud the appellant.

"The burden of proving a fraudulent intent is with the party applying for the writ [of attachment], and circumstances which may create a strong suspicion, but yet fall short of *prima facie* proof, are not sufficient. Thompson v. Dater, [57 Hun 316] 10 N.Y.S. 613, [32 N.Y.St.Repr. 361]; Bump v. Daheny, [59 Hun 619] 12 N.Y.S. 901 [36 N.Y.St.Rep. 114]." J. H. Mohlman Co. v. Landwehr, supra.

For the same reasons, the papers fail to show a cause of action under Section 276 of the Debtor and Creditor Law.

I would deny the petition for rehearing.